32 F.3d 658
 Mark ARKIN & Susan Arkin, Plaintiffs-Appellants,
v.
Roger GITTLESON, Defendant-Appellee,
Stephen Goldman, M.D., Douglas Held, John Doe, Dawn Marie
Frankwick, L.I. Jewish Hospital, Shapiro, M.D., L.I. Jewish
Medical Center, William Ladner, Jeffrey W. Marx, Richard Ira
Roberts, Guillermo San Roman, Defendants.
 No. 1249, Docket 93-9119.
 United States Court of Appeals,
Second Circuit.
 Argued April 28, 1994.
Decided July 21, 1994.
As Amended Aug. 23, 1994.
 
 Cynthia A. Matheke, New York City (Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., of counsel), for plaintiffs-appellants.
 Andrea M. Alonso, New York City (Morris, Duffy, Alonso & Marulli, John E. Morris, John J. Duffy, and Alan H. Sproul, of counsel), for defendant-appellee Roger Gittleson, M.D.
 Before: LUMBARD, VAN GRAAFEILAND and WINTER, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Susan Arkin and her husband Mark Arkin appeal from an October 5, 1993 judgment of the Eastern District of New York (Tsoucalas, J.[1] ), granting judgment as a matter of law[2] to Dr. Roger Gittleson. The Arkins sued Dr. Gittleson after he allegedly mistreated Susan for a pulmonary embolism that developed following childbirth by cesarean section at Long Island Jewish Medical Center in Queens. The embolism eventually resulted in permanent partial blindness. At a jury trial in July 1993, the Arkins presented expert testimony that Dr. Gittleson should have treated Susan differently and that if he had, "this would not have happened." Dr. Gittleson presented expert testimony that there is no way to tell whether and to what extent Susan would have suffered injury if he had treated her differently. The jury found Dr. Gittleson liable and awarded $1,202,500 to the Arkins. Dr. Gittleson moved for judgment as a matter of law, and the district court granted the motion on the ground that the Arkins failed to present evidence that Dr. Gittleson's negligence proximately caused Susan's injuries. We reverse.
 
 I.
 
 2
 In 1985, Susan, at age 40, wished to have a baby, but was concerned about the risks at her age. She placed herself under the care of Dr. Gittleson, who advised that she should be able safely to give birth. Susan became pregnant, and continued under the care of Dr. Gittleson and his partner, Dr. Richard Roberts.
 
 
 3
 Records from an office visit in June 1986 show that Susan had edema--swelling--in her legs, which is common during pregnancy. Records from several subsequent office visits, however, contain no reference to continued edema.
 
 
 4
 On July 14, 1986, Susan entered the early stages of labor. The Arkins went to the office of Dr. Roberts, who advised that Susan was very early in childbirth and that it was unnecessary to go to the hospital yet. By 10 p.m., as Susan's contractions became discomforting and unsteady, the Arkins went to the hospital. Dr. Roberts examined Susan at about 11:30 p.m., and after efforts to induce natural childbirth, performed a cesarean section at 4:30 a.m. on July 15.
 
 
 5
 On July 16, Dr. Gittleson visited Susan and found her doing well. Susan Roach-Darcy, an assistant nursing care coordinator, cared for Susan and recorded Susan's condition on July 16 and 17. On July 16 at 11 p.m., Susan's blood pressure was 140 over 80, her pulse was 90, and her abdomen was softly distended. She suffered no edema, shortness of breath or difficulty in breathing, each of which would have been noted if present.
 
 
 6
 On July 17, Susan's blood pressure was 130 over 80, her pulse was 80, and her abdomen was soft. At 11 p.m., Susan complained of abdominal pain, and received medication. Edema in her feet and ankles was noted.
 
 
 7
 On July 18, Mark arrived at 3 p.m. He testified that Susan looked gray, and that she complained of nausea and difficulty in breathing. Tricia Lewis, a registered nurse, recorded Susan's condition. At 5 p.m., Susan's blood pressure was 140 over 84, her pulse was 104 and her abdomen was distended with underactive bowel sounds noted (abdominal pain and dysfunction are symptoms of a paralytic ileus, a common post-operative condition). She was assisted out of bed to the bathroom, and returned to bed complaining of lightheadedness and tingling around her nose and ears. She continued to complain of dizziness, and her vital signs were checked again. Her blood pressure was 90 over 60, her pulse was 120 and her respiration rate was 30 and regular. She appeared nervous, and Lewis encouraged her to do relaxed breathing exercises. Another check of vital signs showed that Susan's blood pressure was 124 over 80, her pulse was 120 and her respiration rate was 24 and regular. Lewis consulted with Dr. Stephen Goldman, a resident, who instructed that Susan should be observed for continued signs of lightheadedness or orthostatic hypotension (the lowered blood pressure and increased pulse that sometimes occur when people rise from a position of rest).
 
 
 8
 At 5:15 p.m., Susan complained of severe abdominal discomfort. Two milligrams of Dilaudid--a narcotic painkiller--were administered. Susan indicated relief.
 
 
 9
 At 6 p.m., Susan was resting comfortably. At 7 p.m., Susan was in the company of Mark and another visitor, had no complaints and appeared to be resting comfortably.
 
 
 10
 At 7:40 p.m., Dr. Gittleson arrived. Mark testified that he expressed concern about Susan's appearance to Dr. Gittleson, who assured that Susan's breathing difficulty was not serious and explained that "Susan gets hyper and gets excited." Dr. Gittleson had Susan breathe into a paper bag. Roach-Darcy testified that Dr. Gittleson had come to the nurses' station to obtain a paper bag.
 
 
 11
 At 8:30 p.m., Susan was assisted out of bed to the bathroom and returned to bed complaining of dizziness. A check of vital signs showed that her blood pressure was 100 over 60 and her pulse was 150. Dr. Gittleson was in attendance and was noted as aware of the vital signs. Susan complained of severe abdominal pains. She was encouraged to relax and breathe deeply. Upon another check, her blood pressure was 130 over 90 and her pulse was 160. Dr. Gittleson was still in attendance. Circumoral cyanosis--blueness around the mouth, a sign of oxygen deprivation--was noted, and Dr. Gittleson was noted as being aware of it. Lewis testified that she asked Dr. Gittleson why Susan was purple around the lips. He said she might be hyperventilating.
 
 
 12
 At 8:50 p.m., two milligrams of Dilaudid were administered at Dr. Gittleson's direction. He then left the hospital.
 
 
 13
 At 9:15 p.m., Susan was resting without complaints.
 
 
 14
 At 9:45 p.m., Susan complained of lightheadedness. Her blood pressure could not be obtained even though she was placed in a supine position. Her pulse was 160. Lewis alerted Roach-Darcy, who obtained a blood pressure of 60 over 54, a pulse of 170 and a respiratory rate of 24 and regular. Although Susan had no shortness of breath and no chest pains, she complained of severe abdominal pain and tightness in her chest. Roach-Darcy called for assistance. Susan's blood pressure was still 60 over 54. Lewis's notes show that Susan's color was pale, that the circumoral cyanosis continued and that her abdomen remained distended. Susan demanded "Get my bra off ... I don't care if you cut it off ... Get my bra off." Dr. Goldman arrived. Susan's blood pressure now was 60 over 50. Oxygen was administered via face mask.
 
 
 15
 At 10 p.m., an arterial blood gas measurement was obtained, and proved normal. Susan complained of a burning sensation on her face and forehead.
 
 
 16
 At 10:05 p.m., Dr. Gittleson returned to the hospital. Susan was transferred to a recovery room where more space and equipment were available. She talked to the attending caregivers all the way to the recovery room, but then she fell back, apparently unconscious. A code for assistance with a cardiac arrest was called in the hospital. Dr. Roberts inserted an endotracheal tube to get oxygen into Susan's lungs. Numerous other steps--including chest compression and cardiac defibrillation--were taken throughout the night and succeeded in saving Susan's life. Altogether, Susan suffered three cardiac arrests.
 
 
 17
 The cause of Susan's cardiac arrests was uncertain until well into the night. One suspected cause was a pulmonary embolism: a blood clot that travels through the blood stream, lodges in the pulmonary blood vessels, blocks blood flow to the lungs, prevents acquisition of oxygen and discharge of carbon dioxide, and causes dilatation of the heart and deprivation of oxygen to the rest of the body, including the brain. Pulmonary embolisms are a common danger for women after childbirth, because their bodies manufacture extra coagulants to handle bleeding associated with birth. Clots often form in the lower legs, and can break off and travel through the bloodstream to the pulmonary area.
 
 
 18
 The team that treated Susan performed lung scans during the early morning of July 19, and by 3 a.m. or 4 a.m. settled on a pulmonary embolism as the likely cause. To prevent recurrence of the problem, Susan initially was heparinized (given an anticoagulant or blood-thinner). When doctors feared that she might have suffered brain damage, they ceased heparinization and, about 11 p.m., installed a Greenfield filter, which is a small screen placed in a major blood vessel to break up clots in the bloodstream.
 
 
 19
 On the afternoon of July 19, Susan indicated to Mark that she could not see. Expert testimony established that the cardiac arrests had deprived oxygen to the region of Susan's brain that processes visual images, resulting in cortical blindness characterized by a reduction in her field of vision. Her condition showed some improvement at first, but then stabilized in what her ophthalmologist termed a permanent case of a left homonymous field defect and a minimal right visual field defect. Susan lacks any useful vision to the left, and also lacks some vision to the lower right. The impairment seriously restricts her capacities.
 
 
 20
 In January 1989, the Arkins brought suit in the district court against Dr. Gittleson and numerous other defendants, including Dr. Goldman. The Arkins claimed that the defendants negligently treated Susan and that the negligence caused her injuries. The action against all but Drs. Gittleson and Goldman was dismissed before trial, and the action against Dr. Goldman was dismissed at trial.
 
 
 21
 A jury trial was held from July 19 to 26, 1993. The parties presented conflicting testimony on whether Dr. Gittleson's acts or omissions caused Susan's blindness. The Arkins called Dr. Sivam Ramanathan, an obstetric anesthesiologist who specializes in post-partum recovery. He testified that pulmonary embolism is one of the leading causes of death associated with childbirth; that pregnant women are at increased risk of developing clots in their pelvic and calf veins; and that women who undergo cesarean sections have a fourfold increased risk. Although small clots may break off and flow through the bloodstream without harm, a large clot may cause blockage in the pulmonary area, with severe results. That was what happened to Susan. In Dr. Ramanathan's opinion, the increased swelling in her legs after birth, plus her other symptoms--cyanosis and an "extremely abnormally high" heart rate--should have alerted Dr. Gittleson to the possibility of a pulmonary embolism before he left her at the hospital. Dr. Gittleson's treatment--the paper bag and the deep breathing instruction related to the erroneous hyperventilation diagnosis--violated accepted standards of care. The paper bag worsened Susan's condition by further depriving her of oxygen. And the dose of Dilaudid directed by Dr. Gittleson at 8:50 p.m., added to the 5:15 p.m. dose, probably resulted in a narcotic overdose that explains Susan's resting comfortably at 9:15.
 
 
 22
 Dr. Ramanathan testified that a pulmonary embolism can be treated if detected early: Dr. Gittleson should have administered oxygen, taken a blood gas measurement, done an EKG, metered Susan's pulse and consulted a specialist. The Arkins' counsel asked:
 
 
 23
 Q. Doctor, do you have a--do you have an opinion to a reasonable degree of medical probability, had treatment been instituted by Dr. Gittleson at the time--at approximately 8:30 p.m., as you have outlined, whether the two cardiac arrests and the long-term hypoprofusion that is reflected in the record between 10:00 o'clock and the following morning could have been prevented?
 
 
 24
 * * * * * *
 
 
 25
 A. I don't know if Gittleson was capable of doing these things. Maybe he should have gotten a different doctor to do it.
 
 
 26
 I don't know if he would have instituted all of the procedures that I recommended. I would have gotten another consultant, a medical specialist to look at this. If he would have come on the scene, this would not have happened.
 
 
 27
 Counsel then asked whether it was a deviation from accepted standards of medical care for Dr. Gittleson to have left the hospital without seeking assistance, and Dr. Ramanathan replied: "I don't think it's accepted standards of care, what he did."
 
 
 28
 On cross-examination, Dr. Ramanathan stated his opinion that Susan suffered several small showers of pulmonary emboli before a big one hit. Asked whether there was "anything that could be done to prevent a pulmonary embolist,"[3] he replied: "You cannot prevent a pulmonary embolist but you could alleviate some of its catastrophic effects on the individual."
 
 
 29
 Dr. Ian Schorr, Susan's ophthalmologist, testified that Susan's condition is "a direct result of [the] episode of cardiac arrest."
 
 
 30
 Dr. Gittleson testified at trial and in a deposition that he had no recollection of most of the salient details about his treatment of Susan: the cyanosis, the undiminished pulse, the hyperventilation and anxiety diagnosis, the paper bag, the time of his visit, his ordering medication or whether he left instructions at the hospital in case of further episodes. He did, however, recall that Susan did not complain of shortness of breath, that her pulse was under 120 when he left the hospital at 8:50 p.m. and that he stayed all night at the hospital after he returned.
 
 
 31
 He defended the paper bag treatment as appropriate for a hyperventilating patient who blows off too much carbon dioxide. The bag forces the patient to reinhale the carbon dioxide. He defended his leaving the hospital on the ground that he believed Susan's condition had stabilized with her pulse under 120. He disagreed with nurse Lewis's notes which record a pulse of 150 before his departure. He defended his failure to react to the edema on the ground that it was no different from, and in fact was a continuation of, the edema recorded during Susan's June 1986 office visit--notwithstanding the absence of any notation of edema in the intermediate medical records.
 
 
 32
 He admitted that if he had been aware of circumoral cyanosis, he would have acted differently:
 
 
 33
 Q. Doctor, assuming you had seen circumoral cyanosis ... would you tell us what treatment or care you would have instituted with regard to it?
 
 
 34
 A. The major, if I had seen that or was aware of that occurring, I would be concerned she was not getting enough oxygen and whether this was secondary to pneumonia, pulmonary embolism or other reasons, gastric dilatation, that is the stomach dilating too much and impeding the blood supply.
 
 
 35
 Or something wrong with the lungs per se, where she just wasn't getting enough oxygen.
 
 
 36
 I would probably at that moment in time have called in a medical consultation to find out possibly what the cause of this was.
 
 
 37
 Although circumoral cyanosis is not always serious, he stated: "I would be alarmed by that, and if I saw it, I would have acted further at the time." Asked whether he would have made a record of the cyanosis, he replied: "The note would have included that and I would have acted upon that, please order certain x-rays and call in a medical consultation to make sure that we weren't dealing with anything more significant." He maintained, however, that he was never aware of circumoral cyanosis in Susan. His opinion at the time was that things were not going as well as he would have liked, but that everything would be fine.
 
 
 38
 He testified that there is no way to prevent a pulmonary embolism. He entertained pulmonary embolism as a diagnosis, but dismissed it because he thought that Susan's condition had stabilized. And he emphasized that he would have been hesitant to institute treatment for a pulmonary embolism for fear that the real problem might be internal bleeding that would be exacerbated by the treatment.
 
 
 39
 Dr. Gittleson called Dr. Richard Hausknecht, who testified that the pulmonary embolism was not preventable and that there is no way to know whether the ensuing injuries were preventable at the time Dr. Gittleson treated Susan.
 
 
 40
 Q. ....
 
 
 41
 Suppose you suspected a pulmonary embolism in Susan Arkin at that moment in time, what could you do to prevent it?
 
 
 42
 A. If it was going to happen in a matter of an hour or a half hour, nothing that you can do.
 
 
 43
 * * * * * *
 
 
 44
 Q. ....
 
 
 45
 Doctor, I ask you to assume that at 8:30 a medical consultation had been called by Dr. Gittleson, and as a result of the medical consultation, Susan Arkin's blood gases were drawn, her heart rate was monitored, and she was started on oxygen.
 
 
 46
 Can you state with a reasonable degree of medical probability, what injury she would or would not have sustained as a result of a pulmonary embolism followed by cardiac arrest?
 
 
 47
 A. I don't know how you could possibly predict that.
 
 
 48
 Q. Is there any way of looking into hindsight to know what part could be prevented, what part could not be prevented?
 
 
 49
 A. I just don't see how one even with the benefit of hindsight could say, well, at some fixed point medical intervention would have prevented this very, very unfortunate thing that happens.
 
 
 50
 On cross-examination, Dr. Hausknecht conceded that he would have acted differently if faced with Susan's high pulse and cyanosis, but he insisted that any failure on Dr. Gittleson's part "didn't make very much difference in this case."
 
 
 51
 At the close of Susan's case, Dr. Gittleson moved for judgment as a matter of law based on Susan's alleged failure to make out a prima facie case. He asserted that the Arkins had submitted no proof of proximate causation. The district court reserved decision, and did so again when the motion was renewed at the close of testimony.
 
 
 52
 The jury found Dr. Gittleson liable, and awarded $1,202,500 in damages: $947,500 to Susan, including $750,000 in pain and suffering, $165,000 in lost earnings and $32,500 in medical expenses; and $255,000 to Mark for lost services.
 
 
 53
 On August 2, Dr. Gittleson filed a written motion for judgment as a matter of law, or in the alternative to set aside the verdict as excessive or for a new trial. On August 9, after oral argument, the district court granted the motion for judgment as a matter of law, finding no evidence that Dr. Gittleson caused Susan's injuries; rather, the jury verdict was based solely on sympathy for the Arkins. On August 18, the district court entered an order directing that judgment be entered for Dr. Gittleson.
 
 II.
 
 54
 In reviewing the grant of a motion for judgment as a matter of law, we apply the same standard as the district court. Samuels v. Air Transport Local 504, 992 F.2d 12, 14 (2d Cir.1993). The motion "should be denied unless, viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached.' " Id. (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970)). It is improper to grant judgment as a matter of law unless there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 168 (2d Cir.1980).
 
 
 55
 To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries. See, e.g., Lee v. Shields, 188 A.D.2d 637, 639, 591 N.Y.S.2d 522, 524 (2d Dep't 1992); Gibson v. D'Amato, 97 A.D.2d 905, 905, 470 N.Y.S.2d 739, 740 (3d Dep't 1983), app. denied, 61 N.Y.2d 603, 460 N.E.2d 1360, 472 N.Y.S.2d 1027 (1984). The parties do not dispute that there was sufficient evidence for the jury to conclude that Dr. Gittleson departed from ordinary standards of care. Dr. Ramanathan testified to that effect, and Dr. Gittleson admitted that he would have acted differently if he had been aware of the circumoral cyanosis. Hospital records showed that Dr. Gittleson was so aware.
 
 
 56
 Nor do the parties dispute that Susan's cardiac arrests caused her cortical blindness. Dr. Schorr so testified; the clotting caused a pulmonary embolism, which caused cardiac arrests, which caused deprivation of oxygen, which caused damage to the eyesight area of the brain, which caused permanent cortical blindness.
 
 
 57
 Rather, the parties dispute whether the evidence supports the jury's conclusion that Dr. Gittleson could have prevented the cardiac arrests. We hold that it does. Dr. Ramanathan testified that Dr. Gittleson could have prevented the severe consequences of the pulmonary embolism: that he could have performed tests and monitoring, administered oxygen and an anti-coagulant, and consulted with a specialist, and that if he had done so, "this would not have happened." Dr. Ramanathan further testified that proper action can "alleviate some of the catastrophic effects" of a pulmonary embolism, even if the embolism itself cannot be prevented. The chain of causation was complete; Dr. Ramanathan testified that the cardiac arrests and long-term hypoprofusion were preventable, and Dr. Schorr testified that the cardiac arrests directly caused the blindness. The issue therefore was one for the jury, not for the court.
 
 
 58
 Apart from the question of liability, the district court found that the jury's award of damages was "more than reasonable." Except for liability, Dr. Gittleson does not question the award.
 
 
 59
 Reversed with instructions to enter judgment in favor of the Arkins, as found by the jury, in the total amount of $1,202,500, with post-judgment interest accruing from Aug. 3, 1993, the date of the original judgment.
 
 
 
 [1]
 Judge Nicholas Tsoucalas, United States Court of International Trade
 
 
 [2]
 The parties and the district court use the term "judgment notwithstanding the verdict." The more appropriate term since the adoption of the 1991 amendments to the Federal Rules of Civil Procedure has been "judgment as a matter of law," which we use here
 
 
 [3]
 The trial transcript refers occasionally to an "embolist." The correct term probably should be either "embolus" or "embolism," but the transcript is quoted verbatim in this opinion