Mae A. D'Agostino, U.S. District Judge:
I. INTRODUCTION
On August 3, 2017, Plaintiffs Christina M. Mann, Vicki Mann, and William K. Mann III filed a second amended complaint bringing claims for medical malpractice and wrongful death arising out of a failure to diagnose lung cancer in the decedent, William K. Mann Jr. ("Mr. Mann"). See Dkt. No. 58.[1] The Court held a bench trial on August 7, 2017, through August 9, 2017. At the trial, Plaintiffs called two expert witnesses: Dr. Jordan L. Haber, an expert in radiology; and Dr. Ronald H. Blum, an expert in oncology and internal medicine. Plaintiffs also called Vicki Mann, Mr. Mann's surviving spouse, and Donnell Raysor, a family friend, as well as Mr. Mann's four children: Christina M. Mann, William K. Mann III, Marcus D. Mann, and Alice A. Mann. The Government called Dr. Richard Sullivan, who was Mr. Mann's primary care physician at the Department of Veterans Affairs Outpatient Clinic in Rome, New York. Additionally, excerpts of two depositions were played for the Court: one of the decedent, Mr. Mann, and the other of Dr. John C. Sandborn, a radiologist who was employed by the Syracuse VA Medical Center.
Having reviewed the parties' pre-trial submissions, the trial transcript and exhibits, and the parties' post-trial briefs, the Court makes the following findings of fact and conclusions of law.
II. FINDINGS OF FACT[2]
A. The Parties and Jurisdiction
1. Plaintiff Christina M. Mann was born on June 10, 1987, and is a resident of Utica, New York. See Transcript of Trial ("Tr.") at 365. She is William K. Mann Jr.'s daughter and a co-executor of his estate. See id.
2. Plaintiff William K. Mann III was born on May 14, 1985, and is a resident of Yorkville, New York. See id. at 302. He is William K. Mann Jr.'s son and a co-executor of his estate. See id.
3. Plaintiff Vicki Mann is the widow of William K. Mann Jr. See id. at 108.
4. Defendant United States of America owns and operates the Syracuse VA
*415 Medical Center in Syracuse, New York.
5. Plaintiffs sue the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.
B. Medical History
6. On May 25, 2011, Mr. Mann was seen by Dr. Richard Sullivan at the Department of Veterans Affairs Outpatient Clinic in Rome, New York. See Dkt. No. 46 at ¶ 2.
7. Dr. Sullivan performed a new patient physical and ordered a chest x-ray, see id. at ¶ 3, and he listed the reasons for the chest x-ray as "baseline, hypertension, smoker," see Pls.' Ex. 2 at 58.
8. On May 25, 2011, Dr. John C. Sandborn was employed as a radiologist by the Syracuse VA Medical Center and interpreted Mr. Mann's chest x-ray within the scope of that employment. See Dkt. No. 46 at ¶¶ 4-5.
9. In his May 25, 2011 radiology report reviewing Mr. Mann's x-ray, Dr. Sandborn made the following notation: "impression: negative chest." See Pls.' Ex. 2 at 58-59.
10. Plaintiffs' radiology expert, Dr. Haber, testified that given Mr. Mann's history of smoking the radiologist reviewing his chest x-ray should have been looking for lung cancer, which can present as either a "coin lesion" or a "spiculated lesion." See Tr. at 28-30.
11. Mr. Mann's May 25, 2011 chest x-ray showed a 1.5 centimeter nodular density in the upper left lobe of his lung. See id. at 36.
12. The lesion present on Mr. Mann's chest x-ray should have been clearly visible to a radiologist. See id. at 39.
13. Dr. Haber and Dr. Ronald Blum, Plaintiffs' oncology expert, testified that the lesion present in Mr. Mann's May 25, 2011 x-ray indicated that Mr. Mann had cancer and that a CAT scan was required in order to prove otherwise. See id. at 37, 259-60.
14. Upon discovering the lesion in Mr. Mann's x-ray, a radiologist following the standard of care would have communicated that finding to the patient's doctor and advised that a CAT scan would be necessary. See id. at 36.
15. Dr. Sandborn's interpretation of Mr. Mann's chest x-ray was a departure from good and accepted medical practices for a radiologist in New York State in 2011. See id. at 42-43.
16. Dr. Blum stated that he had a reasonable degree of medical certainty that Mr. Mann's lesion was stage 1A lung cancer as of May 25, 2011, and that it was not metastatic. See id. at 237.
17. If Mr. Mann's lung cancer had been diagnosed in May 2011, then it would likely have been surgically removed and he would not have required any further treatment in order to achieve a seventy percent probability of cure. See id. at 237.
18. In January 2014, Mr. Mann was hospitalized for multiple days at Rome Memorial Hospital and a chest x-ray was performed, which showed a lesion described in a report as "a vague area of nodularity" measuring 2.2 centimeters. See id. at 263.
19. There is no evidence that Rome Memorial Hospital communicated to Mr. Mann's doctors at the VA hospital that there was evidence of malignancy. See id. at 267.
20. Dr. Blum stated that it was his opinion, with a reasonable degree of medical *416 certainty, that Mr. Mann already had stage IV metastatic lung cancer as of January 2014. See id. at 254.
21. Mr. Mann was not diagnosed with cancer until July 2014 when he was diagnosed with stage IV metastatic lung cancer that had spread into his spine. See id. at 238.
22. When his cancer was diagnosed on July 25, 2014, it was inoperable and, according to Dr. Blum, it was "basically incurable," with a fourteen percent probability of long-term survival. See id. at 244.
23. As part of his treatment, Mr. Mann underwent kyphoplasty, which is an attempt to reinforce the bones in the back to prevent impingement on the spinal cord and potential paralysis. See id. at 245; Pls.' Ex. 5 at 989, 1007-08.
24. Mr. Mann was also treated with four cycles of chemotherapy, which were intended to relieve symptoms but not necessarily to impact survival; the treatment was palliative not curative. See Tr. at 245, 248.
25. Although the chemotherapy shrunk the primary tumor by a small amount, Mr. Mann had persistent pain in his back because of the metastases impinging on nerves in that area. See id. at 246.
26. To treat Mr. Mann's back pain, he underwent stereotactic radiation to his spine, see id. at 246; Pls.' Ex. 5 at 989, and he began using a wheelchair for transportation, see Pls.' Ex. 24 at 20:47-22:14.
27. Despite the kyphoplasty and radiation, Mr. Mann was hospitalized numerous times for severe back pain; he was also hospitalized for abdominal pain, general weakness, failure to thrive, and other reasons. See Pls.' Ex. 13 at 3, 12; Pls.' Ex. 5 at 1537, 1607, 2231, 2290, 2389, 3262, 3279, 3511.
28. Mr. Mann developed signs and symptoms of brain metastases and began palliative radiation to the brain on August 31, 2015. See Tr. at 247-48.
29. In November 2015, imaging studies showed new metastases in the lungs and liver. See id. at 250.
30. As a result of his cancer-as well as the radiation and multiple rounds of chemotherapy he underwent to treat the cancer-Mr. Mann struggled with nausea, shortness of breath, and extreme fatigue. See id. at 250-52.
31. Mr. Mann also had extreme pain that is characteristic of bone metastases ; his pain was treated with substantial doses of narcotics, but they did not control the pain. See id. at 252-53.
32. In January 2016, Mr. Mann became extremely ill with a failing respiratory system and he was intubated. See id. at 250.
33. Mr. Mann chose to undergo another round of chemotherapy even though it was very unlikely to benefit him. See id. at 251.
34. Mr. Mann died on March 3, 2016. See Dkt. No. 46 at ¶ 8.
C. Personal History
35. Mr. Mann was born on June 10, 1958. See Dkt. No. 46 at 2.
36. Mr. Mann was the father of four adult children: William Mann III, born in 1985; Marcus Mann, born in 1986; Christina Mann, born in 1987; and Alice Mann, born in 1990. See Tr. 302, 365, 393, 421.
37. At the time of his death, Mr. Mann was married to Vicki Mann, who he began dating in November 2001 and married on April 25, 2009. See id. at *417 109. Vicki Mann has three adult children of her own, who are not related to Mr. Mann. See id. at 116.
38. Mr. Mann had a bachelor's degree from SUNY Polytechnic Institute and had worked as a substitute teacher and as an aide at a center for foster children after receiving his degree. See id. at 113-14.
39. At the time of Mr. Mann's diagnosis, he was receiving Social Security Disability Benefits due to a back injury from an automobile accident that occurred in 1992. See id. at 111-12; Def.'s Ex. A at 12.
40. Since that car accident, Mr. Mann had complained of chronic back pain, took prescribed controlled substances, and at times used a cane. See Def.'s Ex. A at 12; Tr. at 343-45, 416-17, 457-58.
41. Mr. Mann had a history of drug and alcohol abuse, including a history of substance abuse treatment. See Pls.' Ex. 2A at 1079-84; Def.'s Ex. D at 8:44-10:42.
42. Mr. Mann tested positive for cocaine multiple times at primary care appointments and other doctors visits between 2010 and early 2014. See Def.'s Ex A at 1; Pls.' Ex 2A at 1096, 1146, 1150.
43. Prior to his cancer diagnosis, Mr. Mann reported having a history of depression. See Def.'s Ex. A at 8; Pls.' Ex. 2A at 1295-97.
44. In consultations with medical personnel in May 2011 and January 2014, Mr. Mann reported suicidal ideation. See Pls.' Ex. 2A at 1098-99, 1031-33. Mr. Mann also reported attempting suicide. See id. at 1098.
45. Mr. Mann's marriage with Vicki Mann was coming to an end before he was diagnosed with cancer, and he had already initiated divorce proceedings; Mr. Mann stated in a deposition that he believed they would have been divorced had he not been diagnosed with cancer. See Def.'s Ex. D at 0:15-1:30, 11:58-15:03; Tr. 355, 420.
46. During the course of their marriage, Mr. Mann and Vicki Mann lived separately on multiple occasions, including September 2015 until Mr. Mann's death in March 2016. See id. at 11:58-15:03; Tr. 132, 410.
47. In counseling sessions between July 2013 and August 2015, Mr. Mann frequently referred to Vicki Mann as his "estranged wife." See Pls.' Ex. 2A at 887, 911, 925, 939-40, 955-60, 1019, 1079-84.
48. When Mr. Mann lived with Vicki Mann, he did a variety of work in and around their apartment, including maintenance, painting, and mechanical work, as well housework and cooking. See Tr. at 143-44.
49. As a result of Mr. Mann's death, Vicki Mann is receiving a $1,254 per month from the VA, which she will receive for the rest of her life. See id. at 217.
50. Each of Mr. Mann's four children testified to having a close relationship with their father, and stated that Mr. Mann provided them with advice, guidance, small amounts of money, and other types of assistance. See Tr. at 316, 326, 377-79, 396-401, 423-25.
51. William Mann III moved out of his father's house in 2005, shortly after graduating high school, but he moved back in with his father on two occasions: he stayed with his father for a year after losing a job in 2012, and again in 2014 when he was recovering from ankle surgery. See id. at 309 *418 52. Mr. Mann also helped William Mann III in other ways-Mr. Mann occasionally gave his son small amounts of cash, babysat his children, and once helped him buy a car. See id. at 314, 324.
53. Marcus Mann is a father to five children, and Mr. Mann frequently provided babysitting services for Marcus. See id. at 394. Marcus also received occasional financial help from his father, who purchased a car and a phone for Marcus and clothing and toys for his children. See id. at 394, 397-98,
54. Christina Mann also received various types of assistance from her father, including help with college applications and school work, as well as pocket money and occasional financial help when she needed it. See id. at 367-68. Christina moved in with Mr. Mann in 2015 after he was diagnosed with cancer. See id. at 369.
56. Alice Mann lived with her father until graduating from SUNY Polytechnic Institute in 2013, and Mr. Mann helped her with her application and financial aid issues. See id. at 422-23. Alice moved to Washington D.C. after college, but spoke with her father nearly every day and he provided guidance and advice. See id. at 424.
57. After his cancer diagnosis, Mr. Mann struggled with various physical ailments that required numerous hospitalizations, as well mental anguish caused by the knowledge of his impending death. See id. at 249-53.
58. According to William Mann III, Mr. Mann transformed from an outgoing, energetic, and upbeat person into the "complete opposite of the person he was before."See id. at 330. He isolated himself and was exhausted, sad, and angry. See id.
59. Despite the pain caused by his underlying disease and the side effects of his treatments, Mr. Mann requested an additional round of chemotherapy that was not likely to be helpful, and he asked to be intubated and resuscitated. See id. at 251.
59. At his August 12, 2015 deposition, Mr. Mann stated "I'm not done. I still have life. I still have my children and my grandchildren, and I'm not ready to leave them yet. I'm not ready. I've got to fight as much as possible so I can be there for them." See Pls.' Ex. 24 at 23:25-24:00.
60. Mr. Mann's will stated that he wanted his "body [to] be buried in a Christian like manner and that [his] four children ... be able to come together and decide what to put on the stone that will be placed on [his] grave." See Def.'s Ex. G at 1.
III. CONCLUSIONS OF LAW
A. Legal Standard
"In a bench trial such as this, it is the Court's job to weigh the evidence, assess credibility, and rule on the facts as they are presented." Bahrami v. Ketabchi , No. 05 Civ. 3829, 2009 WL 513790, *9 (S.D.N.Y. Feb. 27, 2009) (quoting Johnson-McClean Techs. v. Millennium Info. Tech. Grp. , No. 02 Civ. 244, 2003 WL 192175, *8 (S.D.N.Y. Jan. 27, 2003) ) (internal quotation marks and alterations omitted); see also Mathie v. Fries , 121 F.3d 808, 811-12 (2d Cir. 1997). "The Court [is] 'in the best position to evaluate [each] witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says.' " Bahrami , 2009 WL 513790, at *9 (quoting Donato v. Plainview-Old Bethpage Cent. Sch. Dist. , 96 F.3d 623, 634 (2d Cir. 1996) ); see also *419 Anderson v. City of Bessemer City , 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (noting that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"). If the "evidence is equally divided ... 'the party with the burden of proof losses.' " Bahrami , 2009 WL 513790, at *9 (quoting U.S. v. Gigante , 39 F.3d 42, 47 (2d Cir. 1994) ); see also Fulop v. Malev Hungarian Airlines , 244 F.Supp.2d 217, 223 (S.D.N.Y. 2003) (finding that "[t]he evidence on this issue is substantially divided and, in the Court's assessment, does not tilt sufficiently to Plaintiff's case to satisfy the preponderance standard").
B. Medical Malpractice and Wrongful Death
1. Liability
Under Section 5-4.1 of the New York Estates Powers and Trusts Law, "a personal representative of a decedent may maintain a wrongful death action provided the defendant 'would have been liable to the decedent by reason of such wrongful conduct if death had not ensued.' " Coolidge v. United States , No. 10-CV-363, 2015 WL 5714237, *5 (W.D.N.Y. Sept. 29, 2015) (quoting LaMarca v. United States , 31 F.Supp.2d 110, 124 (E.D.N.Y. 1998) ). "This language means 'that no action may be maintained by the representative unless the decedent, at the time of his death, could have maintained an action for the underlying tort.' " LaMarca , 31 F.Supp.2d at 120 (quoting Dundon v. United States , 559 F.Supp. 469, 475-76 (E.D.N.Y. 1983) ). To establish wrongful death based on medical malpractice, a plaintiff must prove that the malpractice was the proximate cause of death. See Dentes v. Mauser , 91 A.D.3d 1143, 1144, 937 N.Y.S.2d 409 (3rd Dep't 2012).
"Under New York law, a medical malpractice plaintiff must prove '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.' " Stelman v. United States , No. 14-CV-5363, 2016 WL 5315196, *12 (S.D.N.Y. Sept. 21, 2016) (quoting Arkin v. Gittleson , 32 F.3d 658, 664 (2d Cir. 1994) ). Additionally, " 'except as to matters within the ordinary experience and knowledge of laymen,' an expert medical opinion 'is required to make out both of these elements.' " Id. (quoting Milano v. Freed , 64 F.3d 91, 95 (2d Cir. 1995) ). Here, Plaintiffs established both prongs of their medical malpractice claim at trial.
First, Plaintiffs showed that the treatment Mr. Mann received did not meet the standard of care in New York. The Second Circuit has provided the following guidance regarding the standard of care:
A physician's obligations to his patient are to possess at least the degree of knowledge and skill possessed by the average member of the medical profession in the community in which he practices, to exercise ordinary and reasonable care in the application of that professional knowledge and skill, and to use his best judgment in the application of his knowledge and skill.
Sitts v. United States , 811 F.2d 736, 740 (2d Cir. 1987). Plaintiffs called Dr. Jordan L. Haber, a board-certified radiologist with decades of experience, to provide expert medical testimony regarding Dr. Sandborn's interpretation of Mr. Mann's May 25, 2011 x-ray. Dr. Haber testified that the failure to identify the lesion in Mr. Mann's May 25, 2011 chest x-ray and to order follow-up testing constituted a departure from good and accepted medical practices for a radiologist in New York State in 2011. Tr. at 44. The Government did not *420 provide any expert testimony to contradict Dr. Haber's opinion.
Second, Plaintiffs also established that the failure to meet the standard of care was a proximate cause of Mr. Mann's death. "A defendant's negligence qualifies as a proximate cause where it is 'a substantial cause of the events which produced the injury.' " Mazella v. Beals , 27 N.Y.3d 694, 706, 37 N.Y.S.3d 46, 57 N.E.3d 1083 (2016) (quoting Derdiarian v. Felix Contr. Corp. , 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980) ). "When a question of proximate cause involves an intervening act, 'liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence.' " Hain v. Jamison , 28 N.Y.3d 524, 529, 46 N.Y.S.3d 502, 68 N.E.3d 1233 (2016) (quoting Mazella , 27 N.Y.3d at 706, 37 N.Y.S.3d 46, 57 N.E.3d 1083 ).
Dr. Ronald Blum, an oncologist with particular expertise in lung cancer, was called by Plaintiffs to testify about the issue of proximate cause. According to Dr. Blum, Mr. Mann had Stage 1A lung cancer at the time of his May 25, 2011 chest x-ray, and he would have had a seventy percent chance of survival at five years through surgical treatment alone. See Tr. at 237. By the time Mr. Mann's cancer was ultimately diagnosed in July 2014, he had Stage IV metastatic cancer that was essentially untreatable. See id. at 238, 242. Once again, the Government did not provide an expert witness to contradict Dr. Blum's testimony. However, in its post-trial brief, the Government argues that Rome Hospital's failure to diagnose Mr. Mann's lung cancer in January 2014-just six months before he was eventually diagnosed-was an "intervening causal event." See Dkt. No. 75 at 3-4. The Court disagrees. Dr. Blum testified that Mr. Mann already had Stage IV metastatic cancer when the x-ray was taken in January 2014, and the Government provided no expert medical testimony contradicting Dr. Blum's opinion. See Tr. at 254.
The Government contested liability at trial and in its post-trial brief, but it would have been prudent for the Government to admit liability. The Government did not call a single witness to refute liability. In the Court's view, the medical malpractice of the defendant is flagrant, totally below any acceptable level of care, and in this case it was fatal. The attempt by the Government to argue that Rome Hospital's similarly unacceptable failure to diagnose the lung tumor was an intervening cause is disingenuous, as the actual diagnosis of lethal lung cancer was made only six months later and Plaintiffs' expert stated that at the time Rome Hospital performed the chest x-ray, Mr. Mann's diagnosis was already Stage IV metastatic cancer. At that time, the Court concludes that Mr. Mann was already a dead man walking. For all of the aforementioned reasons, the Court finds that Plaintiffs proved their claim of medical malpractice and wrongful death.
2. Damages
a. Conscious Pain and Suffering
After his diagnosis in July 2014, Mr. Mann lived for approximately twenty months until his death in March 2016. Over the course of those twenty months, Mr. Mann endured enormous pain and suffering. He underwent radiation to the spine and brain, as well as several rounds of chemotherapy; he was admitted to the hospital numerous times for back pain, stomach pain, and general weakness; he suffered extreme pain due to bone metastases ; and Mr. Mann was forced to use a wheelchair. In addition to his many physical symptoms, Mr. Mann also showed signs of emotional suffering and the mental *421 anguish of impending death; he became isolated, sad, exhausted, and angry. Mr. Mann lived day after day with no hope. Despite all of that-and despite Mr. Mann's pre-existing depression and mental health problems-he expressed that he wanted to take every step to preserve his life for as long as possible. Mr. Mann requested additional chemotherapy even when it was very unlikely to help, and he asked to be intubated and resuscitated even though such measures would ultimately be futile. Although Mr. Mann had a substance abuse problem, he was honest about those issues, he was confronting them, and he continued living his life and caring for his children.
In comparable cases, plaintiffs have been awarded a range of damages awards for conscious pain and suffering. In Mandel v. New York County Public Administrator , 29 A.D.3d 869, 870, 815 N.Y.S.2d 275 (2d Dep't 2006), the plaintiff's doctors failed to diagnose her lung cancer and she lived for approximately 24 months after eventually being diagnosed. The Second Department upheld the jury's award of $2,000,000 in damages for pain and suffering. See id. In Birkbeck v. Central Brooklyn Medical Group , No. 4598/97, 2001 WL 1154985, *3 (N.Y. Sup. Ct. Aug. 22, 2001), the plaintiff's doctor failed to diagnose lung cancer and he lived for approximately four months after his eventual diagnosis. The jury awarded $1,000,000 in conscious pain and suffering, which the trial judge reduced to $750,000, finding that "$750,000 ... for the pain and suffering of a 64-year-old decedent suffering for months from belatedly diagnosed, advanced lung cancer reasonable compares with other pertinent cases." See id. In this case, the Court finds that $1,250,000 is an appropriate award for Mr. Mann's conscious pain and suffering.
b. Mr. Mann's Children
It is well established in New York that financially independent adult children may recover pecuniary damages under New York's wrongful death statute. See Gonzalez v. N.Y.C. Hous. Auth. , 77 N.Y.2d 663, 668-89, 569 N.Y.S.2d 915, 572 N.E.2d 598 (1991). "In the case of a decedent who was not a wage earner, 'pecuniary injuries' may be calculated, in part, from the increased expenditures required to continue the services [he or she] provided, as well as the compensable losses of a personal nature, such as guidance." Hyung Kee Lee v. N.Y. Hosp. Queens , 118 A.D.3d 750, 754, 987 N.Y.S.2d 436 (2d Dep't 2014) (quoting Gonzalez , 77 N.Y.2d at 668, 569 N.Y.S.2d 915, 572 N.E.2d 598 ).
Mr. Mann did not provide his children with huge sums of money or regular financial assistance. However, Mr. Mann did provide some financial help to his children, as well as advice, guidance, and other compensable services. Therefore, the Court finds that Mr. Mann's children-William Mann III, Marcus Mann, Christina Mann, and Alice Mann-are entitled to $25,000 each in pecuniary damages. See Rubin v. Aaron , 191 A.D.2d 547, 547, 594 N.Y.S.2d 797 (2d Dep't 1993) (reducing a pecuniary damages award from $100,000 to $25,000 in a wrongful death case for an adult daughter who "relied heavily upon the decedent for advice and guidance").
C. Vicki Mann
New York common law does not recognize causes of action to recover damages for wrongful death separate from the statutory cause of action accorded to a decedent's distributees. See Liff v. Schildkrout , 49 N.Y.2d 622, 631-32, 427 N.Y.S.2d 746, 404 N.E.2d 1288 (1980) (citing N.Y. E.P.T.L. § 5-4.1 ). A surviving spouse, in her individual capacity, does not *422 have a claim for loss of consortium due to her spouse's death. See id. , at 631, 427 N.Y.S.2d 746, 404 N.E.2d 1288. The surviving spouse can, however, recover for loss of consortium for the period prior to the decedent's death, which is a derivative action of the decedent's claim for conscious pain and suffering. See id. at 632, 427 N.Y.S.2d 746, 404 N.E.2d 1288. The phrase "loss of consortium" generally refers to grief, loss of society, affection, and conjugal fellowship. See Ruiz v. N.Y.C. Health & Hosps. Corp. , 165 A.D.2d 75, 80, 566 N.Y.S.2d 217 (1st Dep't 1991) (citing Liff , 49 N.Y.2d at 633, 427 N.Y.S.2d 746, 404 N.E.2d 1288 ).
In this case, Vicki Mann is entitled to damages for loss of consortium during the approximately twenty months between Mr. Mann's cancer diagnosis and his death, as well as pecuniary damages for wrongful death. See Dkt. No. 73 at 14. Mr. Mann and Vicki Mann were in a long-term relationship; they had been married since 2008, dating since 2001, and she continued to have a presence in his life even after she moved out of their apartment in September 2015. Tr. at 357. However, it is clear that problems in their marriage had arisen well before Mr. Mann's cancer diagnosis and that Mr. Mann had initiated divorce proceedings prior to his diagnosis. The Court is not persuaded by Plaintiffs' argument that the problems in the marriage were caused by changes in Mr. Mann's behavior resulting from his disease. See Dkt. No. 73 at 12-13. Similarly, the Court does not believe Vicki Mann's testimony that Mr. Mann never mentioned divorce prior to his diagnosis. Tr. at 137. The Court finds that a total award of $20,000 in damages for Vicki Mann is appropriate in this case.
d. Loss-of-Chance Doctrine
The Government argues that Plaintiffs' damages award should be reduced according to the loss-of-chance doctrine. See Dkt. No. 75 at 18-19. Mr. Mann already had Stage I lung cancer at the time of the medical malpractice in January 2011, and Dr. Blum testified that his likelihood of survival was approximately seventy percent if he had been diagnosed and treated at that time. Therefore, the Government argues, Plaintiffs are not entitled to the full amount of total damages caused by Mr. Mann's disease. See id. In support of this position, the Government cites to Birkbeck v. Central Brooklyn Medical Group , No. 4598/97, 2001 WL 1154985, *3 (N.Y. Sup. Ct. Aug. 22, 2001), which states that "a physician should be subject to liability only to the extent that he contributed to the harm. Therefore, the amount of damages recoverable should be equal to the percent of chance lost multiplied by the total value of a complete recovery." See id. (quoting Jorgenson v. Vener , 616 N.W.2d 366, 371 (S.D. 2000) ), abrogated by S.D. Codified Laws § 20-9-1.1. But the Court has serious doubts about whether Birkbeck represents the state of the law in New York.
The loss-of-chance doctrine is an approach to causation that is primarily used in medical malpractice cases. The doctrine "permits plaintiffs to recover damages for the reduction in the odds of recovery attributable to a defendant," even when that reduction is less than fifty percent. Crosby v. United States , 48 F.Supp.2d 924, 926 (D. Alaska 1999).[3] In *423 New York, Kallenberg v. Beth Israel Hospital , 45 A.D.2d 177, 357 N.Y.S.2d 508 (1st Dep't 1974), was the seminal case establishing a cause of action for the loss of chance. In Kallenberg , the plaintiff was permitted to recover for a less than forty percent loss of chance of survival caused by a doctor's medical malpractice. See id. at 179-80, 357 N.Y.S.2d 508.
The states that have adopted the loss-of-chance doctrine "have taken varying views on whether full damages are recoverable, or whether damages should be reduced so as to reflect the amount of chance that was lost." McKain v. Bisson , 12 F.3d 692, 696 (7th Cir. 1993) (citing Martin J. McMahon, Annotation, Medical Malpractice: Measure and Elements of Damages in Actions Based on Loss of Chance , 81 A.L.R.4th 485 (1990) ). Courts in New York state have not adopted a mathematical formula for quantifying damages based on the value of the lost chance, such as the formula proposed in Birkbeck . See Lee S. Kreindler, New York Law of Torts § 8:21 (August 2017 Update) (noting that New York is among the states that "award damages for the actual death or aggravated injury" rather than "the total value of the lost chance"). Indeed, the plaintiff's recovery in Kallenberg was not reduced based on the percent of chance lost. See Kallenberg , 45 A.D.2d at 178, 357 N.Y.S.2d 508.[4]
In this case, however, the Court need not consider how the loss-of-chance doctrine might impact the calculation of damages. Plaintiffs' expert stated that the failure to diagnose Mr. Mann's lung cancer reduced his chance of survival from seventy percent to fifteen percent. As medical malpractice was more likely than not the cause of Mr. Mann's death, Plaintiffs did not rely on the loss-of-chance doctrine to establish causation. Therefore, the Court declines the Government's request to reduce the damages in this case.
IV. FUNERAL EXPENSES AND MEDICAL BILLS AND
Plaintiffs provided the Court with an invoice stating that Mr. Mann's funeral expenses amounted to $7,327. See Pls.' Ex. 22. The Government has stipulated to adding this amount to any damages award in the event that liability is found. See Dkt. No. 75 at 15. Therefore, the Court will add $7,327 to the total damages award.
As for Mr. Mann's medical bills, the parties appear to have come to an agreement, but the Court requires further clarification. The Government states that the federal government has already paid for Mr. Mann's medical expenses-either through Medicare, the VA, or CHAMPVA, a comprehensive health care benefits program administered by the VA-and the Government therefore will not reimburse Mr. Mann's medical expenses. See Dkt. No. 75 at 14. However, to the extent that Plaintiffs' damages award is subject to a federal government lien arising from Mr. *424 Mann's medical expenses, the Government agrees to either release the lien or to add the lien amount to any judgment issued by the Court. See id.
Plaintiffs have submitted records of Mr. Mann's medical bills, but both the records and the accompanying letter are unclear. See Dkt. No. 72. First, the letter itself is not clear in regard to the nature of the stipulation regarding medical expenses. See id. Second, the letter states the following: "I have gone through the list and believe that none of the VA expenses are duplicates of payments made by Medicare. I, therefore, feel the total amount of medical expenses to be $529,337.65; and Medicare is $[SIC] $91,757.10. The VA spreadsheet totals $529,337.65." See id. The Court cannot determine whether the total medical expenses are meant to be the sum of the VA expenses and the Medicare expenses ($621,094.75) or whether the total expenses are, as Plaintiffs assert, the same amount as the VA spreadsheet ($529,337.65). Therefore, Plaintiffs' request for medical expenses is denied with leave to refile. Both Plaintiffs and the Government must submit letters to the Court within fourteen days clearly explaining their positions with respect to Mr. Mann's medical expenses.
V. CONCLUSION
After carefully reviewing the parties' pre-trial submissions, the trial transcript and exhibits, and the parties' post-trial briefs, the applicable law, and for the above-stated reasons, the Court hereby
ORDERS that Plaintiffs are awarded $1,377,327 in total damages, consisting of $1,250,000 in pain and suffering; $25,000 in pecuniary damages to each of Mr. Mann's four children for a total of $100,000; $20,000 in damages to Vicki Mann; and $7,327 in funeral expenses; and the Court further
ORDERS that Plaintiffs' request for medical expenses (Dkt. No. 72) is DENIED with leave to refile , and both parties must submit letters to the Court within fourteen (14) days clearly explaining their positions in regard to Mr. Mann's medical expenses; and the Court further
ORDERS that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.
IT IS SO ORDERED.

The parties stipulated pursuant to Federal Rule of Procedure 15 to the filing of the second amended complaint. See Dkt. No. 60.

Prior to trial, the parties submitted a Joint Pre-Trial Stipulation, which contained certain stipulated jurisdictional and undisputed facts. See Dkt. No. 46. The Court's findings of fact are derived both from the parties' stipulated facts and the Court's findings based upon the trial transcript and exhibits.

While the reduction may be less than fifty percent, it is not entirely clear what reduction in chance is sufficient. New York courts have generally adopted the standard that medical malpractice claims based on loss of chance are actionable when plaintiffs are deprived of a "substantial possibility" of recovery. See Clune v. Moore , 142 A.D.3d 1330, 1331 (4th Dep't 2016) ; Candia v. Estepan , 289 A.D.2d 38, 39, 734 N.Y.S.2d 37 (1st Dep't 2001) ; Kimball v. Scors , 59 A.D.2d 984, 985, 399 N.Y.S.2d 350 (3d Dep't 1977).

Even where courts have reduced damages in loss-of-chance cases, they do not do so in proportion to the chance lost. In Stewart v. New York City Health & Hospitals Corp. , 207 A.D.2d 703, 616 N.Y.S.2d 499 (1st Dep't 1994), a plaintiff had a ten percent chance of conceiving a child through sexual intercourse, but that chance was lost due to medical malpractice. The jury in that case awarded the plaintiff $500,000, but the Appellate Division reduced that award to $300,000. See id. at 704, 616 N.Y.S.2d 499. Even though the loss of chance was just ten percent, the court did not reduce the plaintiff's damages award in proportion to her loss of chance; instead, the court explained that the reduced damages "more adequately compensate[d] plaintiff for her injury." See id.