21-548-cv
*Gonzalez v. United States*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2021

(Argued: March 9, 2022    Decided: August 24, 2023)

No. 21-548-cv

_____

MIRIAM GONZALEZ, individually and
as Executrix of the Estate of Robert R. Salazar, deceased,

*Plaintiff-Appellant*,

— v. —

UNITED STATES OF AMERICA,

*Defendant-Appellee*.*

_____

Before:        CHIN, SULLIVAN, and BIANCO, *Circuit Judges*.

Plaintiff-Appellant Miriam Gonzalez, on behalf of herself and as Executrix of the Estate of Robert R. Salazar, her deceased husband, brought claims under the Federal Tort Claims Act against the United States alleging that, between October 2015 and August 2016, a U.S. Department of Veterans Affairs hospital negligently failed to diagnose Salazar with lung cancer.  Prior to trial, the government

_____

* The Clerk of Court is respectfully directed to amend the caption as set forth above.

conceded that the hospital's ten-month failure to diagnose Salazar was a departure from the standard of care. Following a two-day bench trial, the district court (Daniels, *J.*) entered judgment and awarded $975,233.75 in damages to Gonzalez, including $850,000 for pain and suffering and $50,000 for loss of consortium.

On appeal, Gonzalez argues: (1) the district court erred in failing to adequately explain its factual findings and methodology for arriving at its awards for both pain and suffering and loss of consortium, as required under Federal Rule of Civil Procedure 52(a); and (2) the district court's awards for pain and suffering and loss of consortium were based on legal errors, including that the awards were inadequate in light of comparable New York cases.

As a threshold matter, we clarify that the appropriate standard of review for assessing a district court's FTCA damages award governed by New York law is whether the award "deviates materially from what would be reasonable compensation," as articulated under New York Civil Practice Law and Rules § 5501(c), not whether the award "shocks the conscience," as is the standard under federal law. We nonetheless find Gonzalez's challenges to the district court's damages awards to be unpersuasive. The district court's explanation for the awards in its factual findings and conclusions of law, as well as in its denial of the motion to amend or alter the judgment as to these awards, satisfied the requirements of Rule 52. Moreover, we discern no legal error in the district court's explanation of its determination of the awards and hold that the awards did not deviate materially from what would be reasonable compensation under New York law.

Accordingly, we **AFFIRM** the judgment of the district court. Judge Sullivan concurs in part and dissents in part in a separate opinion.

> GARY A. BARBANEL, Law Office of Gary A. Barbanel, New York, NY (Peter Wessel, Law Office of Peter Wessel, PLLC, New York, NY, *on the briefs*), *for Plaintiff-Appellant*.

RACHAEL L. DOUD (Anthony J. Sun, Benjamin H. Torrance, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Defendant-Appellee*.

JOSEPH F. BIANCO, *Circuit Judge*:

Plaintiff-Appellant Miriam Gonzalez ("Gonzalez"), on behalf of herself and as Executrix of the Estate of Robert R. Salazar ("Salazar"), her deceased husband, brought claims under the Federal Tort Claims Act ("FTCA") against the United States alleging that, between October 2015 and August 2016, a U.S. Department of Veterans Affairs ("VA") hospital negligently failed to diagnose Salazar with lung cancer. Prior to trial, the government conceded that the VA hospital's ten-month failure to diagnose Salazar was a departure from the standard of care. Following a two-day bench trial, the district court (Daniels, *J.*) entered judgment and awarded $975,233.75 in damages to Gonzalez, including $850,000 for pain and suffering and $50,000 for loss of consortium.

On appeal, Gonzalez argues: (1) the district court erred in failing to adequately explain its factual findings and methodology for arriving at its awards for both pain and suffering and loss of consortium, as required under Federal Rule

3

of Civil Procedure 52(a); and (2) the district court's awards for pain and suffering and loss of consortium were based on legal errors, including that the awards were inadequate in light of comparable New York cases.

As a threshold matter, we clarify that the appropriate standard of review for assessing a district court's FTCA damages award governed by New York law is whether the award "deviates materially from what would be reasonable compensation," as articulated under New York Civil Practice Law and Rules ("CPLR") § 5501(c), not whether the award "shocks the conscience," as is the standard under federal law. We nonetheless find Gonzalez's challenges to the district court's damages awards to be unpersuasive. The district court's explanation for the awards in its factual findings and conclusions of law, as well as in its denial of the motion to amend or alter the judgment as to these awards, satisfied the requirements of Rule 52. Moreover, we discern no legal error in the district court's explanation of its determination of the awards and hold that the awards did not deviate materially from what would be reasonable compensation under New York law.

Accordingly, we **AFFIRM** the judgment of the district court.

4

## I.     The Trial Evidence

Salazar and Gonzalez met in 1962 and were married for nearly fifty-seven years before Salazar died in August of 2018.  On October 7, 2015, at seventy-five years old, Salazar was an emergency room patient at a hospital owned and operated by the VA's New York Harbor Healthcare System (the "VA Hospital"). Dr. Robert Hessler conducted an examination of Salazar and ordered chest x-rays. Dr. Kwang Myung reviewed the x-ray results, which showed an abnormality in Salazar's lung, and recommended a CT scan be taken for further investigation. However, Dr. Hessler did not make any notation in Salazar's medical chart concerning the x-ray results, did not order any follow-up testing as recommended by Dr. Myung, and did not inform Salazar's primary care provider of the follow-up recommendation.

Following the October 7, 2015 emergency-room visit, Nurse Practitioner Catherine Glasser conducted Salazar's primary care visits at the VA Hospital. When Glasser first treated Salazar on October 13, 2015, Salazar was not experiencing chest pain, shortness of breath, or other medical problems, aside from his diabetes, and, according to Glasser, was in "pretty good shape for a 75-

year-old man." *Gonzalez v. United States*, 612 F. Supp. 3d 336, 341 (S.D.N.Y. 2020) (internal quotation marks and citation omitted). Indeed, Gonzalez testified at trial that, up until the summer of 2016, Salazar "ran two to three miles several times a week, went to the gym, danced, socialized, traveled, and had an intimate relationship with her." *Id.* at 343 (citation omitted).

On August 17, 2016, approximately ten months after the initial x-rays, Salazar was admitted to the VA Hospital "with chief complaints of difficulty breathing, sore throat, and weight loss," and was ultimately diagnosed with Stage IIIA lung cancer. *Id.* at 342 (internal quotation marks and citation omitted). Salazar's health subsequently deteriorated: He felt exhausted, lost his appetite, experienced continual shortness of breath, and began to lose his voice. About a month later, in September 2016, Salazar was diagnosed with paraneoplastic necrotizing autoimmune myositis, a disease that weakened his muscles, caused him to develop a heart condition, and forced him to rely on a feeding tube for the final twenty-three months of his life.

Salazar began radiation therapy in November 2016 and received thirty radiation treatments. During a three-month period of treatment at a rehabilitation center, he lost his ability to speak and had to be retrained to walk. Salazar began

6

receiving chemotherapy in early 2018, which included side effects such as loss of hair and appetite, and he eventually could not be left alone because he had fallen twice in his house when trying get out of bed. Thereafter, Salazar's lung cancer progressed to Stage IV. He died from complications related to his cancer on August 28, 2018.

Gonzalez's expert witness in medical oncology, Dr. Edward Gelmann, testified at trial that, when Salazar's chest x-rays showed an abnormality on October 7, 2015, Salazar's cancer was at Stage I, and, if the cancer had been diagnosed at that time, Salazar "had a reasonable chance of cure." *Id.* at 344 (internal quotation marks and citation omitted). In particular, Dr. Gelmann testified that Salazar had a survival rate of forty-eight percent in October 2015. Dr. Gelmann also testified that Salazar "more likely than not [would have] avoided developing paraneoplastic autoimmune syndrome" had he been diagnosed with cancer in October 2015 and treated sooner. *Id.* at 348 (internal quotation marks and citation omitted).

The government's expert in medical oncology, Dr. Ashish Saxena, also testified at trial about causation. Although Dr. Saxena testified that he was unable to determine the exact stage of Salazar's cancer on October 7, 2015 based solely on

the x-rays, he stated that "there was a good chance that it was less than Stage III" and, if the cancer was at Stage I, the standard treatment would have been surgery, not chemotherapy. *Id.* at 344 (internal quotation marks and citation omitted). Dr. Saxena further "testified that Salazar's cancer was Stage III in August 2016, and that if the stage had been lower [than Stage III] in October 2015, then Salazar's prognosis . . . would have been better." *Id.* at 345 (citation omitted). Dr. Saxena explained, however, that "for those patients who are treated for clinical stage [I] whose cancer has not upstaged to a higher stage, the rate of recurrence of their cancer can be as high as 40 percent." *Id.* at 347 (alterations adopted) (internal quotation marks and citation omitted).

## II.     Procedural History

Following Salazar's August 2016 lung cancer diagnosis and September 2016 myositis diagnosis, Salazar and Gonzalez filed a complaint against the United States, the VA Hospital, and various medical professionals in their individual capacities, alleging a series of claims under the FTCA. *See* 28 U.S.C. § 1346(b)(1). Plaintiffs then filed an amended complaint solely against the United States on June 26, 2017, and the district court scheduled a trial for September 4, 2018. Salazar died in August 2018, and the court adjourned the trial. On February 22, 2019, Gonzalez

8

filed a second amended complaint after being appointed executrix of Salazar's estate.

Prior to trial, the government conceded that the VA Hospital's ten-month failure to diagnose Salazar with lung cancer beginning around October 2015 was a departure from the standard of care. The district court held a two-day bench trial on June 17, 2019 and July 10, 2019, solely on the issues of whether the delay in diagnosis proximately caused Salazar's injuries and death and, if so, the damages to be awarded, including pain and suffering, loss of services, loss of consortium, medical expenses, and funeral expenses.[1] Both parties called medical

---

[1] Courts have not consistently distinguished loss of services and loss of consortium. Sometimes, courts have regarded a loss-of-consortium claim to extend beyond the loss of "love, companionship, affection, society, sexual relations, solace and more" to include the loss of a spouse's economically quantifiable services. *Millington v. Se. Elevator Co.*, 22 N.Y.2d 498, 502 (1968). In other instances, courts have used the phrase "loss of services" interchangeably with "loss of consortium." *See, e.g.*, *In re Joint E. & S. Dist. Asbestos Litig.*, 964 F.2d 92, 96 (2d Cir. 1992) (describing a single "loss of services and consortium claim"); *Briggs v. Julia L. Butterfield Mem'l Hosp.*, 479 N.Y.S.2d 758, 758 (2d Dep't 1984) (using "loss of services" to describe features of the marital relationship traditionally associated with loss of consortium). Here, the district court *did* distinguish between Gonzalez's loss of "the pecuniary value of the services that [Salazar] formerly performed" and the loss of their marital relationship. *Gonzalez*, 612 F. Supp. 3d at 349–50 (quoting *Zavaglia v. Sarah Neuman Ctr. for Healthcare & Rehab.*, 883 N.Y.S.2d 889, 892 (N.Y. Sup. Ct. 2009) (internal quotation marks omitted)). The parties seem to have made a similar distinction: They stipulated to an amount of damages for the loss of Salazar's services, but Gonzalez's counsel stated in a letter to the court that her separate "claim for loss of consortium . . . includes the loss of the love, affection and society of her husband." J. App'x at 174 (internal quotation marks and citation omitted).

9

expert witnesses to testify as to the impact of the VA's delay in diagnosis and resulting damages. The parties stipulated to $55,000 in loss-of-services damages in the event Gonzalez proved causation.

As to loss of consortium, Gonzalez's counsel filed a pre-trial letter noting that "the Court should award the sum of at least $6 million dollars for the Plaintiff Salazar and $2million [sic] for his wife's losses," but did not specify how much of the amount for Gonzalez was for loss of services versus loss of consortium. J. App'x at 58. On June 25, 2019, following Gonzalez's testimony during the first day of trial, Gonzalez's counsel submitted a letter to the court acknowledging that, although she was seeking an award for loss of consortium, counsel "didn't ask her specifics, nor did [counsel] ask if [their intimate] relationship changed in the two years prior to [Salazar's] passing" during her trial testimony. *Id.* at 59. The letter, however, suggested that "Gonzalez testified in her deposition that her husband could not physically and emotionally provide the kind of care that she was accustomed to having with him," including that "[h]e couldn't perform sexually since the time he was hospitalized in August of 2016." *Id.* The letter also enclosed the pages from Gonzalez's deposition transcript containing that testimony. During the second day of the bench trial, when the district court questioned why

10

it should accept the deposition testimony of Gonzalez when she had the opportunity to provide live testimony, Gonzalez's counsel withdrew the request to have the district court consider Gonzalez's deposition testimony.

On March 31, 2020, the district court issued a twenty-one-page memorandum decision and order, containing nine pages of detailed findings of fact as well as conclusions of law based on the bench trial. With respect to causation, the district court engaged in a comprehensive analysis, concluding that "it [was] very likely that Salazar's cancer was Stage I at the time" of his visit to the VA Hospital in October 2015, and "Salazar would have faced a better prognosis had he been diagnosed at that time." *Gonzalez*, 612 F. Supp. 3d at 347. The district court determined that "[t]he evidence at trial also established that Salazar would have undergone different treatment had he been diagnosed in October 2015"— namely, "rather than being subjected to chemotherapy and radiation, he very likely would have only had surgery." *Id.* at 348. Based on that evidence, the district court concluded that Gonzalez had "proven by a preponderance of the evidence that the [g]overnment's ten-month delay in diagnosing Salazar's lung cancer was a substantial factor in causing Salazar's injuries and death and that absent this delay, Salazar would have had a chance at a better outcome." *Id.* Thus,

11

Gonzalez had proven that "the delay proximately caused [Salazar's] injuries and death and that the [g]overnment [was] liable for the damages arising from such injuries and death." *Id.* The district court then awarded $850,000 for Salazar's pain and suffering, $55,000 for loss of services, $50,000 for loss of consortium, $10,000 for medical expenses, and $10,233.75 for funeral expenses.

With respect to the damages for pain and suffering, in addition to articulating the applicable legal standard under New York law, the district court explained:

> After being diagnosed with lung cancer in August 2016, Salazar lived for two years until his death in August 2018. Prior to his diagnosis, Salazar was social, physically active, and in good shape despite being in his mid-seventies. Following his diagnosis, however, he endured significant pain and suffering. He experienced shortness of breath, fatigue, loss of appetite, muscle aches and weakening, and voice loss. He underwent 30 rounds of radiation treatment, as well as chemotherapy, which resulted in him losing hair and his appetite. He developed paraneoplastic autoimmune syndrome, which forced him to rely on a feeding tube that was inserted in September 2016 and remained inserted until his death[.] Plaintiff testified that her husband ultimately could not be left alone, and that on two occasions, he fell while trying to get out of bed.

*Id.* at 349. The district court further noted that "[d]etermining a monetary figure for an individual's pain and suffering is an unenviable task, but awards issued in comparable New York cases involving failure to diagnos[e] lung cancer provide

12

some guidance." *Id.* The district court then cited three comparable cases under New York law involving a delay in diagnosis, noting the relevant delay, injuries, and pain-and-suffering awards for each. Based upon that analysis, the district court concluded that "$850,000 [was] an appropriate award . . . for Salazar's pain and suffering." *Id.*

With respect to Gonzalez's loss of services and consortium, after describing the relevant legal standard under New York law, the district court explained:

> Here, the parties stipulated that the amount of any damages for loss of services would be $55,000. Plaintiff additionally seeks damages for "loss of consortium for 2 years." Plaintiff does not indicate, however, what amount she is seeking for such loss. Moreover, Plaintiff's counsel did not elicit testimony at trial on the issue of loss of consortium. Nonetheless, given that Plaintiff was married to Salazar for many decades, an award of $50,000 for loss of consortium, on top of $55,000 for loss of services, is appropriate.

*Id.* at 350 (citations omitted). The judgment was entered on March 31, 2020.

On May 29, 2020, Gonzalez filed a motion to alter or amend the judgment under Federal Rules of Civil Procedure 52(b) and 59(e), requesting, *inter alia*, that the district court amend the pain-and-suffering award to an amount between $1,562,017.20 and $3,220,686.24 and amend the loss-of-consortium award to

13

$1,000,000.[2] In particular, she argued to the district court that it: (1) "failed to articulate any intelligible methodology underlying its award for Mr. Salazar's pain and suffering" or loss of consortium in violation of Rule 52(a), Dist. Ct. ECF Dkt. No. 139 at 7–9; (2) failed to account for inflation when considering the damages awards in the three relevant pain-and-suffering cases that were cited and that such an adjustment would justify an award within the range of $1,562,017.20 and $3,220,686.24, *id.* at 9–11; (3) erred in concluding that (a) Gonzalez did not indicate the amount she was seeking at trial for loss of consortium, and (b) she failed to elicit testimony regarding that claim, *id.* at 12–15; and (4) should amend the award for loss of consortium from $50,000 to $1,000,000 to reflect the awards for loss of consortium in analogous cases, *id.* at 15–16.

On March 1, 2021, the district court issued a memorandum decision and order denying Gonzalez's motion to amend the judgment as to the pain-and-suffering and loss-of-consortium awards. The district court emphasized, with respect to the award for pain and suffering, that it did not simply recite Salazar's injuries, but rather took into account "Salazar's age and condition prior to his

---

[2] Gonzalez also sought to have the district court alter the judgment to reflect that the award of $10,000 was not for medical expenses but rather was for out-of-pocket expenses not covered by insurance. The district court granted that portion of the motion and that award is not challenged on appeal.

14

diagnosis, his condition post-diagnosis, the severity of his radiation treatment and chemotherapy, and the length of time he suffered from the time of diagnosis to his death," as well as "the fact that Salazar developed paraneoplastic autoimmune syndrome and was forced to rely on a feeding tube from September 2016 until his death in August 2018." *Gonzalez v. United States*, No. 17-cv-3645, 2021 WL 1606182, at \*2 (S.D.N.Y. Mar. 1, 2021). The district court further explained that it then "identified comparable New York cases involving a failure to diagnose lung cancer" and, "[a]fter considering the evidence presented at trial, in light of the damages awarded in the identified cases, this Court arrived at a reasonable figure that fell within the range of awards in such cases." *Id.* The district court also rejected Gonzalez's contention that its award was a substantial deviation from the amounts awarded in the comparable cases:

> Plaintiff . . . contends that this Court, without explanation, awarded a sum that amounts to a far lower pain and suffering award than those rendered in the cases on which it purportedly relied. Plaintiff's calculations are based on the calculated average monthly compensation awarded for pain and suffering from the time of diagnosis until death. Plaintiff's argument is unavailing. This Court appropriately considered more than the duration of Plaintiff's pain and suffering in fixing fair and reasonable compensation. For example, this Court weighed the nature and extent of Salazar's injuries, his treatment, and the [g]overnment's delay in diagnosing his condition. Plaintiff's challenge as to the sufficiency of this Court's explanation amounts to a disagreement with this Court's assessment.

15

A Rule 52(b) or 59(e) motion is not a vehicle for parties to seek a rehearing on the merits.

*Id.* at \*3 (internal quotation marks and citations omitted).

As to the loss-of-consortium award, the district court reiterated that Gonzalez never explicitly asked for a specific monetary amount and her counsel failed to elicit testimony regarding changes in Salazar and Gonzalez's sexual relationship at trial. Additionally, the district court noted that, even though Gonzalez herself had failed to raise her trial testimony regarding her transition from wife to caretaker in post-trial briefing, it had considered that testimony as "evidence of a deterioration of the marital relationship relevant to calculating damages for loss of consortium," and "reasonably inferred injury to the marital relationship after considering the scope of the concept of consortium, Salazar's injuries, and the length of [Gonzalez's] marriage to Salazar." *Id.* Therefore, as with the award for pain and suffering, the district court held that Gonzalez failed to identify a clear error or manifest injustice sufficient to amend or vacate the judgment under Rule 52(b) or 59(e).

This appeal followed.

**DISCUSSION**

On appeal, Gonzalez does not argue that the district court clearly erred in its findings of fact, but rather contends that: (1) the district court failed to provide sufficient explanation and analysis under Rule 52 for its pain-and-suffering and loss-of-consortium awards; (2) the district court made certain legal errors in calculating the awards; and (3) the awards deviate materially from what would be reasonable compensation under New York law. Gonzalez thus requests that we vacate the district court's judgment and remand with instructions to increase the $850,000 award for pain and suffering and $50,000 for loss of consortium to "such amounts as are consistent with awards in comparable cases." Appellant's Br. at 31.

## I. Standard of Review Under the FTCA

"We review a district court's finding of facts in support of its FTCA damages award for clear error, but we review the nature and measure of its FTCA damages award according to the law of the state in which the tort occurred." *Malmberg v. United States*, 816 F.3d 185, 197 (2d Cir. 2016) (citations omitted). The parties here dispute—and we have yet to clarify—"the appropriate standard of review

17

applicable for a district court's FTCA damages award where the nature and measure of damages is governed by New York law." *Id.* at 199.

Under CPLR § 5501(c), New York's appellate courts "shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." *See also Serrano v. State*, 117 N.Y.S.3d 748, 750 (3d Dep't 2020) (applying standard to review of a damages award following a nonjury trial); *Martin v. Fitzpatrick*, 799 N.Y.S.2d 285, 289 (3d Dep't 2005) (same).[3] Gonzalez asserts that we should apply this "deviates materially" standard in reviewing the adequacy of the damages award under the FTCA. The government contends, however, that we can only overturn a damages award under the FTCA using the federal standard—that is, if it is "so grossly and palpably inadequate as to shock the court's conscience." Gov.'s Br. at 24 (citing *Korek v. United States*, 734 F.2d 923, 929 (2d Cir. 1984)); *see also Gibbs v. United States*, 599 F.2d 36, 39 (2d Cir. 1979) (noting that a court's award of damages for pain and suffering under the FTCA is reviewed for whether it is "so high as to shock the judicial conscience" or serves as "a denial of justice").

---

[3] Although phrased as a direction for appellate review of jury verdicts, the "deviates materially" standard applies to both appellate and trial court review of jury awards, *see Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 425 (1996), as well as to the appellate review of awards following a bench trial, *see Serrano*, 117 N.Y.S.3d at 750.

18

As an initial matter, we note that both *Korek* and *Gibbs* were decided prior to the enactment of Section 5501(c) in 1986, *see Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 423 (1996), and thus we did not have occasion to consider that New York statute's potential impact on the review of damage awards under the FTCA. We now conclude that, not only do "we review the nature and measure of [a district court's] FTCA damages award according to the law of the state in which the tort occurred," *Malmberg*, 816 F.3d at 197, but we must also apply state law regarding the standard of review for assessing the sufficiency of such damages awards.

In *Corley v. United States*, 11 F.4th 79 (2d Cir. 2021), we articulated the framework, as a matter of statutory interpretation under the FTCA, for analyzing whether a particular state law should apply in such a case:

> [S]tate law is the "source of substantive liability under the FTCA." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (internal quotation marks omitted). The FTCA's jurisdictional grant provides district courts with jurisdiction over tort suits against the United States "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Supreme Court has "consistently held that [the FTCA's] reference to the 'law of the place' means law of the State—the source of substantive liability under the FTCA." *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994). Therefore, state law will apply only if it is substantive, rather than procedural, and

district courts applying state law in FTCA suits must determine as a threshold matter whether that law is substantive.

*Id.* at 85.

In determining whether a state law is procedural or substantive in this statutory context, we have drawn from diversity cases decided under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), which establish that "procedural law is 'the judicial process for enforcing rights and duties recognized by substantive law,' while substantive law is 'the law that governs the rights and obligations of individuals within a given jurisdiction.'" *Corley*, 11 F. 4th at 85 (quoting *Pappas v. Philip Morris, Inc.*, 915 F.3d 889, 894 (2d Cir. 2019)); *cf. Jackson v. United States*, 881 F.2d 707, 712 (9th Cir. 1989) ("[The FTCA] specifically makes state law controlling to the extent needed to fix the government's substantive liability.").

Here, there is no question that the standard of review for damages mandated by Section 5501(c) is not a mere procedural enforcement mechanism, but rather a substantive rule that impacts the "rights and obligations of individuals within a given jurisdiction" by affecting the measure of damages a plaintiff may recover. *Corley*, 11 F. 4th at 85; *see also Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008) ("It is also true, though denied by the United States, that in a suit under the [FTCA], as in a diversity suit, the damages rules of the state whose law governs

20

the substantive issues in the case bind the federal court; damages law is substantive law."); *Carter v. United States*, 333 F.3d 791, 794 (7th Cir. 2003) (applying a state-law damages cap in FTCA case "because a cap on damages reflects a judgment about the severity of the sanction appropriate to regulate the activity of potential injurers"); *Jackson*, 881 F.2d at 712 (noting that, for FTCA purposes, a state law is substantive where it "affect[s] the amount the government ultimately pays").

In *Gasperini*, in holding that Section 5501(c) is substantive rather than procedural for *Erie* purposes, the Supreme Court emphasized the impact that the standard of review under Section 5501(c) can have on the amount of a damages award. *See* 518 U.S. at 431. In particular, the Supreme Court explained that the "deviates materially" standard under Section 5501(c) "requires closer court review than the common-law 'shock the conscience' test." *Id.* at 429; *see also Donlon v. City of New York*, 727 N.Y.S.2d 94, 96–97 (1st Dep't 2001) (noting that Section 5501(c) "was adopted as a reform to the former 'shock the conscience'" standard for appellate review and it, "in design and operation, influences outcomes by tightening the range of tolerable awards" (alteration adopted) (quoting *Gasperini*, 518 U.S. at 425)). The effect of this "closer court review" would function somewhat

21

like a cap on damages. *See Gasperini*, 518 U.S. at 429–30; *see also Arpin*, 521 F.3d at 776 (observing that *Gasperini* found New York's heightened review of damages to be substantive because of its tendency to decrease the average damages award and suggesting that thus such a heightened review would also be substantive for FTCA purposes). The Supreme Court thus concluded that, despite Section 5501(c)'s partially procedural instruction, its objective was "manifestly substantive," and noted that if federal courts were to apply the federal "shock the conscience" standard to damages awards on New York state law claims, "substantial variations between state and federal money judgments may be expected." *Gasperini*, 518 U.S. at 429–30 (alterations adopted) (internal quotation marks and citation omitted).

We recognize that *Gasperini* was decided in the context of *Erie*. *See id*. at 428.[4] However, the Supreme Court's analysis in *Gasperini* regarding the substantive impact of Section 5501(c) on damages awards provides helpful guidance in

---

[4] *Cf. Cibula v. United States*, 551 F.3d 316, 321 (4th Cir. 2009) ("[B]ecause the FTCA contains an explicit instruction by Congress regarding which law to use, courts should not engage in their normal *Erie* analysis to make that determination." (citing *Smith v. United States*, 507 U.S. 197, 201 (1993))); *see also Dutton v. United States*, 621 F. App'x 962, 966 (11th Cir. 2015) (noting, in considering whether to apply the Federal Rules of Evidence or state law in an FTCA case, that "[t]his, of course, is an FTCA case, not a supplemental-jurisdiction case, so the *Erie* doctrine does not apply").

determining, as a matter of statutory interpretation under the FTCA, whether Section 5501(c) should be applied in FTCA cases because it substantively affects to what extent (in terms of the measure of damages) "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 (stating that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages").

Therefore, we hold that "where the nature and measure of damages is governed by New York law," *Malmberg*, 816 F.3d at 199, a pain-and-suffering award arising out of the FTCA should be set aside if it "deviates materially from what would be reasonable compensation," CPLR § 5501(c). We emphasize that the district court's factual findings in support of the damages award are reviewed under the deferential "clear error" standard, appropriately considering its important role as factfinder in assessing the evidence and making credibility determinations. *Malmberg*, 816 F.3d at 197. However, we review the adequacy of the award, based upon those findings of fact, under the "deviates materially" standard.

23

Under a slightly separate theory, the government suggests that we should review the district court's "monetization of economic harms"—*i.e.*, damages awards for pain and suffering and loss of consortium—under an abuse of discretion standard, citing to *Presley v. United States Postal Service*, 317 F.3d 167 (2d Cir. 2003). Gov.'s Br. at 24. The government's reliance on *Presley*, however, is misplaced. In that case, we reviewed for abuse of discretion a district court's review of a *jury* award—not an award where the district court was the factfinder in the first instance. *Presley*, 317 F.3d at 173. To be sure, when reviewing a district court's determination regarding the sufficiency of a jury award under the "deviates materially" standard, we have long held that we give significant deference to the district court's judgment under an abuse of discretion standard. *See id.*; *see also Gasperini*, 518 U.S. at 419; *Falzon v. JPMorgan Chase & Co.*, 501 F. App'x 92, 93 (2d Cir. 2012) (summary order) (reviewing for abuse of discretion a district court's application of the "deviates materially" standard to a jury award).

However, where the district court was the factfinder in the first instance, we do not afford the same degree of deference in our review of the adequacy of the

award.[5]  Indeed, in *Presley*, we noted the importance of that distinction.  *See* 317 F.3d at 175 ("[T]he court's roles when conducting a bench trial and in reviewing a jury's verdict under [Section] 5501(c) are distinct.  Under the former, the trial judge must use his or her own judgment to determine an appropriate award; under the latter, the judge must determine whether the verdict 'deviates materially from what would be reasonable compensation.'" (quoting CPLR § 5501(c))).  Here, although the district court consulted analogous New York state cases in reaching its decision regarding the amount of damages, it did so in search of additional guidance in its role as the factfinder, rather than as an application of the "deviates materially" standard under Section 5501(c) that it would have applied if it was reviewing a jury verdict.

Accordingly, "[w]e review a district court's finding of facts in support of its FTCA damages award for clear error," *Malmberg*, 816 F.3d at 197, and, when New York law governs the tort, the amount of damages awarded by the district court after a bench trial "may be set aside [if] it deviates materially from what would be

---

[5]  As the Supreme Court explained in *Gasperini*, we must conduct abuse of discretion review of a district court's assessment of a jury award under Section 5501(c) so that our review is compatible with the Seventh Amendment's Reexamination Clause.  *See* 518 U.S. at 418–19, 431–39.  That same consideration does not apply to a nonjury trial.  *See* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2820 (3d ed. Apr. 2023 update).

reasonable compensation," without any additional deference to the district court's assessment of an appropriate award, *Serrano*, 117 N.Y.S.3d at 750 (alteration adopted) (internal quotation marks and citation omitted).

## II.     Rule 52(a)

Federal Rule of Civil Procedure 52(a) provides that, "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately."  Under Rule 52, courts must "adequately explain the subsidiary facts and methodology underlying the ultimate [damages] finding[s]," but are "not required to provide lengthy analyses."  *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 622 (2d Cir. 2006) (internal quotation marks and citation omitted); *see also Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1097 (2d Cir. 1988) (explaining that Rule 52(a) does not require "either punctilious detail or slavish tracing of the claims issue by issue and witness by witness") (alterations adopted) (internal quotation marks and citation omitted); *accord Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003).

In assessing the adequacy of the district court's explanation under Rule 52 for its damages award, we have recognized that "personal injury awards, especially those for pain and suffering, are subjective opinions which are

26

formulated without the availability, or guidance, of precise mathematical quantification." *Malmberg*, 816 F.3d at 198 (quoting *Reed v. City of New York*, 757 N.Y.S.2d 244, 248 (1st Dep't 2003)); *see also Braun v. Ahmed*, 515 N.Y.S.2d 473, 476 (2d Dep't 1987) ("There is and there can be no fixed basis, table, standard or mathematical rule which will serve as an accurate index and guide to the establishment of damage awards for personal injuries." (internal quotation marks and citation omitted)). However, even in making those subjective assessments, the district court's analysis must be "sufficiently comprehensive and pertinent to the issues" to facilitate appellate review. 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2579 (3d ed. Apr. 2023 update). That is, the district court's opinion must adequately "inform the appellate court of the basis of the decision and . . . permit intelligent appellate review." *Krieger*, 863 F.2d at 1097; *see also Alexander v. Nash-Kelvinator Corp.*, 261 F.2d 187, 190 (2d Cir. 1958) ("The findings required under [Rule 52(a)], including those made as to damages, must be 'made with sufficient particularity so that they may be reviewed.'" (quoting *Hatahley v. United States*, 351 U.S. 173, 182 (1956))).

### III. Pain and Suffering Award

Gonzalez argues that the court failed to provide an adequate explanation of how it arrived at its pain-and-suffering damages award under Rule 52(a), including by failing to note whether it adjusted for inflation when considering awards in prior cases. She further contends that the award was a material deviation under Section 5501(c) from awards in analogous New York cases. We address each argument in turn.

### A. The District Court's Explanation under Rule 52

We conclude that the district court's analysis with respect to its award for pain and suffering did not violate Rule 52.

In determining Salazar's award for pain and suffering, the district court first explicitly noted that, under New York law, "[f]actors to be considered in evaluating such awards include the nature, extent and permanency of the injuries, the extent of past, present and future pain and the long-term effects of the injury." *Gonzalez*, 612 F. Supp. 3d at 349 (internal quotation marks and citation omitted). The district court then summarized the trial evidence that related to those factors, including:

28

- Salazar's condition "[p]rior to his diagnosis"—namely, that he was previously "social, physically active, and in good shape despite being in his mid-seventies";

- His condition "[f]ollowing his diagnosis"—namely, that "he endured significant pain and suffering" including "shortness of breath, fatigue, loss of appetite, muscle aches and weakening, and voice loss";

- The severity of his radiation treatment—specifically, that "[h]e underwent 30 rounds of radiation treatment, as well as chemotherapy, which resulted in him losing hair and his appetite";

- The further delay in, and worsened prognosis of, Salazar's cancer treatment because he "developed paraneoplastic autoimmune syndrome, which forced him to rely on a feeding tube that was inserted in September 2016 and remained inserted until his death," and Salazar "could not be left alone, and that on two occasions, he fell while trying to get out of bed"; and

- The length of time he suffered from the time of diagnosis until his death— that is, "two years."

*Id.*

After enumerating these factors, the district court explained that it also considered awards issued in comparable New York cases involving a failure to diagnose lung cancer because they "provide some guidance." *Id.* The district court specifically cited three such cases under New York law, noting for each the delay in diagnosis and resulting number of months of pain and suffering attributable to the defendant-party. *See id.* (citing (1) *Mann v. United States*, 300 F. Supp. 3d 411 (N.D.N.Y. 2018), and noting that the court awarded $1,250,000 for pain and suffering for a "38-month delay in diagnosis and then, following the eventual diagnosis, 20 months of pain and suffering by the decedent"; (2) *Mandel v. N.Y. Cnty. Pub. Admin.*, 815 N.Y.S.2d 275 (2d Dep't 2006), and noting that the court upheld a jury award of $2,000,000 for pain and suffering after a "29-month delay in diagnosis, followed by a period of 26 months before the decedent passed away"; and (3) *Olsen v. Burns*, 699 N.Y.S.2d 731 (2d Dep't 1999), and noting that the court found the jury's award of $1,146,000 for pain and suffering to be excessive following a "17-month delay [in diagnosis], followed by 8 months of pain and suffering," and required "a new trial unless the plaintiff filed a stipulation consenting to decrease the award to $700,000").

From that analysis, we can discern that the district court considered the relevant legal factors in reaching the award, as well as the trial evidence that related to those factors. We also understand which comparable cases the district court utilized to arrive at the amount of the award and that, with respect to those cases, it deemed the delay in diagnosis and the resulting number of months of pain and suffering attributable to the defendant to be important criteria in comparing the awards. Under these circumstances, the district court satisfied Rule 52 because its analysis is sufficient for us to exercise meaningful appellate review to determine whether the amount of the award was adequate under New York law. *See, e.g.*, *Gibbs*, 599 F.2d at 39 (holding that, although the district court's opinion was "quite cursory in specifying the basis for the damage award" for lost earnings and pain and suffering, no remand was necessary because it was "not a case . . . in which appellate review of the judgment is impossible due to lack of specificity in the district court's findings").

Although Gonzalez relies on our decisions in *Malmberg* and *Henry* to support her position that the district court's analysis violated Rule 52, both cases are clearly distinguishable. In *Malmberg*, the district court did not analyze any of the details of the injury as it related to the relevant factors, but rather only

31

explained in a conclusory and cursory fashion: "As evidenced above, the significant changes to Plaintiff's life are severe and real. They are not, in any sense, mere speculation. Unequivocally, Plaintiff's injuries are permanent, devastating, and catastrophic." 816 F.3d at 198 (citation omitted). Moreover, the district court noted that "[t]he range in New York is normally between $500,000 and $1,500,000 dollars for a pain and suffering award" but failed to cite a single New York case showing how the district court arrived at that range. *Id.* (citation omitted). Finally, the district court awarded damages to the plaintiff at the low end of that range for past pain and suffering and at the high end for future pain and suffering without any explanation as to any of the criteria used to determine those amounts. *See id.* Given that "sparse" record and "[a]bsent further analysis and clearer reasoning by the district court," we concluded that "we [could not] make a fair determination about whether the pain and suffering award is inadequate." *Id.* at 198–99.

In contrast, as noted above, the district court here (1) explained the relevant factors and the trial evidence relating to those factors; (2) specifically cited to three analogous New York cases; and (3) articulated the material facts from those cases, which it used to compare those awards to the factual circumstances of the instant case. Therefore, Gonzalez's reliance on *Malmberg* is misplaced.

We find the circumstances in *Henry* similarly inapposite. In *Henry*, the district court merely "chose a figure that fell between [the figures] offered by the parties," without any further explanation. 445 F.3d at 622 n.4. Not only is that explanation (or lack thereof) in stark contrast to the district court's analysis here, but *Henry* involved damages quantifiable by the economic value of an employee's stock ownership plan, a situation where, unlike the "inescapably subjective" measure of pain and suffering, *Gibbs*, 599 F.2d at 39, there is a much greater ability to articulate the precise methodology and trial evidence utilized to arrive at the economic award under that methodology.

Finally, to the extent that Gonzalez also contends that the case must be remanded under Rule 52 because the district court did not explicitly account for inflation when comparing the instant case to the damages awards in comparable cases, we disagree. To be sure, we have noted that "we must take into account inflation" when assessing comparable cases to determine a reasonable range of compensatory damages, *DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003), and a district court should certainly do the same. However, we have never held that, to comply with Rule 52, a district court must *explicitly* note that it considered inflation in assessing awards in comparable cases, and we decline to remand a case on that

33

basis unless there is some indication in the record that the district court failed to do so. Here, not only is there no indication of such an error in the district court's findings of fact and conclusions of law, but Gonzalez directly raised this precise issue in its motion to alter and amend the judgment and even provided the district court with the inflation-adjusted awards in *Mann*, *Mandel*, and *Olsen*, broken down to reflect a per month amount. In its opinion denying that motion, the district court did not reject the notion that inflation should be considered when reviewing awards in comparable cases, but rather concluded that Gonzalez's calculations were "based on the calculated average monthly compensation awarded for pain and suffering from the time of diagnosis until death," and failed to consider other relevant factors, including "the nature and extent of Salazar's injuries, his treatment, and the [g]overnment's delay in diagnosing his condition." *Gonzalez*, 2021 WL 1606182, at *3. Thus, on this record, there is no basis to have the district court again consider these inflation-adjusted awards when it has already explained its basis for rejecting them.

B. <u>Assessment of the Damages Award</u>

Gonzalez next argues that the $850,000 damages award for twenty-four months of pain and suffering must be increased because it materially deviates

from the damages awards in comparable cases decided under New York law—namely, *Mandel*, 815 N.Y.S.2d at 276 ($2 million for approximately twenty-six months of pain and suffering), *Mann*, 300 F. Supp. 3d at 421 ($1.25 million for approximately twenty months of pain and suffering), and *Olsen*, 699 N.Y.S.2d at 732 ($700,000 for eight months of pain and suffering).[6]   Gonzalez further notes that, when the awards in the prior cases are adjusted for inflation, the deviation is even greater:  $2,616,069 (*Mandel*), $1,335,782 (*Mann*), and $1,101,687 (*Olsen*).

As a threshold matter, to the extent that Gonzalez suggests that the district court was required to arrive at a pain-and-suffering award that corresponded to the inflation-adjusted awards in the other cases using a "per month" multiple based only on the duration of the pain and suffering, we disagree.  Although "prior verdicts may guide and enlighten the court and in a sense, may constrain it," *Senko v. Fonda*, 384 N.Y.S.2d 849, 851 (2d Dep't 1976), they are not meant to provide a "per diem pain and suffering rate," *Donlon*, 727 N.Y.S.2d at 96.  To the contrary, a court must "identif[y] . . . relevant factual similarities" between cases and apply its own "reasoned judgment."  *Id.*

---

[6]  The decision in *Birkbeck v. Cent. Brooklyn Med. Grp.*, No. 4598/97, 2001 WL 1154985 (N.Y. Sup. Ct. Aug. 22, 2001), cited a treatise for the proposition that, in *Olsen*, the award was based on "eight months of pre-death pain and suffering resulting from a failure to diagnose lung cancer," *id.* at *3.

Here, the district court concluded that, in determining the amount of the award as compared to other cases, it should consider not only the duration of the pain and suffering but also the period of delay in diagnosis. Indeed, the district court noted the fact that there was a ten-month delay in diagnosis here as opposed to a twenty-nine-month delay in *Mandel*, a thirty-eight-month delay in *Mann*, and a seventeen-month delay in *Olsen*, and the court considered that fact alongside other factors. The district court awarded $850,000, which, in absolute terms, is less than the awards in *Mandel* and *Mann* but greater than the award in *Olsen* and, in inflation-adjusted terms, is less than the awards in all three comparable cases. In its decision on Gonzalez's motion to alter and amend the judgment, the district court noted that its award reflected its amalgamation of several factors: not only "the duration of Plaintiff's pain and suffering" but also "the nature and extent of Salazar's injuries, his treatment, and the Government's delay in diagnosing his condition." *Gonzalez*, 2021 WL 1606182, at *3. The district court prudentially exercised its discretion to balance these factors, as is evident from the facts that (1) while the delay in Salazar's diagnosis was not as long as the delays in the three comparable cases, (2) the total period of time between the missed diagnosis and the decedent's death in *Mandel* and *Mann* (fifty-five months and fifty-eight

36

months, respectively) was longer than the comparable period here (thirty-four months), but (3) in *Olsen*, only twenty-five months elapsed between the missed diagnosis and the decedent's death.[7]

Gonzalez suggests that the district court's consideration of the VA Hospital's delay in diagnosis was erroneous because Salazar did not experience pain and suffering until *after* his diagnosis and New York pattern jury instructions require that a plaintiff have "some level of awareness" of his pain and suffering in order for it to be compensable. Appellant's Br. at 22–23 (citing N.Y. Pattern Jury Instr. — Civil 2:320). While we agree that "some level of awareness" is required for pain and suffering to be compensable, the VA Hospital's delay is a critical factor in determining proximate cause and resulting damages. First, the government can only be liable for the amount of pain and suffering the VA Hospital's delay caused to Salazar. Here, even Gonzalez's expert (Dr. Gelmann) testified that, if the cancer had been properly diagnosed at that time when

---

[7] Contrary to the dissent's suggestion, *see post* at 4–6, we have never held it is improper for a district court to consider both absolute and inflation-adjusted values into account when comparing awards in similar cases. Gonzalez's motion to alter and amend the judgment put the district court on notice of the inflation-adjusted values of the awards in *Mann*, *Mandel*, and *Olson*. The district court made clear that "the calculated average monthly compensation awarded for pain in suffering" in comparable cases, 2021 WL 1606182, at *3, was but one factor in its determination of the "inescapably subjective" measure of pain and suffering, *Gibbs*, 599 F.2d at 39.

Salazar's chest x-rays showed an abnormality on October 7, 2015, he would have had a survival rate of forty-eight percent at that point in time. Dr. Gelmann also testified that, even if Salazar had been diagnosed with cancer in October 2015, he would have needed surgery to remove the tumor and lymph nodes and, assuming no recurrence of the cancer, could have avoided chemotherapy or radiation. Dr. Gelmann further concluded it was "more likely than not" that Salazar could have avoided paraneoplastic autoimmune syndrome had he been diagnosed with cancer and treated sooner. *Gonzalez*, 612 F. Supp. 3d at 344.

Second, given the testimony regarding causation, the district court did not err in considering the length of the delay. It did so not to compensate Salazar for the period when he reported no symptoms but, instead, to assess how much of Salazar's pain and suffering was proximately caused by the delay and to determine the appropriate award for the period when Salazar experienced pain and suffering. *See, e.g.*, *D.Y. v. Catskill Reg'l Med. Ctr.*, 66 N.Y.S.3d 368, 371 (3d Dep't 2017) ("Where, as here, the plaintiff alleges that the defendant negligently delayed in diagnosing and treating a condition, proximate cause may be predicated on the theory that the defendant diminished the patient's chance of a better outcome or increased the injury.") (alteration adopted) (internal quotation

38

marks and citation omitted); *see also Thompson v. Cmty. Health Plan, Latham Reg'l Ctr.*, 575 N.Y.S.2d 615, 616–17 (3d Dep't 1981) (holding, in a medical malpractice action, that defendants were not liable for damages for course of treatment and prognosis that were not impacted by the delay in diagnosis); *see generally Brooks v. Brattleboro Mem'l Hosp.*, 958 F.2d 525, 531 (2d Cir. 1992) (emphasizing that "the reason for and the effect of the delay in diagnosis and treatment" were "issues crucial to liability as well as to damages").  For the same reasons, the length of the delay in diagnosis was a permissible factor for the district court to consider in comparing the instant case to other New York cases involving a negligent failure to diagnose lung cancer.  As we have noted above, in the personal injury context, awards "are formulated without the availability, or guidance, of precise mathematical quantification." *Malmberg*, 816 F.3d at 198 (internal quotation marks and citation omitted).

In sum, we conclude that the $850,000 award for pain and suffering did not deviate materially from what would constitute reasonable compensation under New York law.

## IV. Loss-of-Consortium Award

Gonzalez similarly asserts that the district court failed to rationalize its $50,000 loss-of-consortium award as required under Rule 52, instead "select[ing] . . . a figure apparently at random." Appellant's Br. at 17. She further argues that the district court erroneously found both that her counsel failed to elicit testimony as to loss of consortium at trial and that she failed to provide the court with a requested amount for the award. Gonzalez asserts that the district court's loss-of-consortium award should fall within the range of $472,000 to $8.15 million, numbers drawn from "analogous" cases (with an adjustment for inflation) and raised for the first time *after* trial. *Id.* at 30.

As an initial matter, contrary to Gonzalez's contention, the district court adequately described the record before it on the loss-of-consortium issue. First, with respect to any request for a specific amount of loss-of-consortium damages, the district court correctly noted that Gonzalez did "not indicate . . . what amount she [was] seeking for such loss." *Gonzalez*, 612 F. Supp. 3d at 350. Gonzalez argues that, because her counsel filed pre- and post-trial memoranda noting that "the Court should award . . . $2million [sic] for [Gonzalez's] losses," J. App'x at 58; *see also* Dist. Ct. ECF No. 124 at 6, the court should have surmised that she was seeking

the difference between the $2 million requested in "losses" and the $55,000 "upon which the parties settled for Appellant's loss-of-services claim," Appellant's Br. at 25. The district court, however, was not required to assume that the settlement for loss of services reflected the full amount of what Gonzalez had been seeking and in not surmising what the requested amount was with respect to loss of consortium.

Second, the district court did not clearly err when it stated that Gonzalez's counsel "did not elicit testimony at trial on the issue of loss of consortium." *Gonzalez*, 612 F. Supp. 3d at 350. Indeed, as the district court referenced, Gonzalez's counsel conceded in his June 25, 2019 letter to the district court that he did not solicit any testimony regarding changes in Salazar and Gonzalez's sexual relationship at trial, and instead requested that the district court consider Gonzalez's relevant testimony during a pre-trial deposition. After the district court questioned why the deposition testimony was necessary when Gonzalez had testified at trial, counsel withdrew the request to introduce deposition testimony on the issue and did not otherwise offer additional proof on this issue during the trial. And while Gonzalez did testify at trial more generally about her transition from Salazar's wife to caretaker, *see, e.g.*, J. App'x at 93, 102, 104–06, the district

court understandably did not specifically address this testimony when initially explaining its loss-of-consortium award, given that Gonzalez herself did not do so in post-trial briefing, *see generally* Dist. Ct. ECF No. 124.

As set forth below, in light of the thin evidentiary record and Gonzalez's counsel's limited submissions on this category of damages, we hold that the district court did not violate Rule 52 in explaining its award, and the award did not materially deviate from what would be reasonable compensation under New York law.

A. The District Court's Explanation under Rule 52

We conclude that the district court's analysis with respect to its award for loss of consortium satisfied the requirements of Rule 52. As to the factors it relied upon in determining the award, the district court noted that"[t]he concept of consortium includes not only loss of support or services, [but also] . . . such elements as love, companionship, affection, society, sexual relations, solace and more." *Gonzalez*, 612 F. Supp. 3d at 350 (quoting *Rangolan v. County of Nassau*, 370 F.3d 239, 247 (2d Cir. 2004)). The district court then explained that, despite the scant evidentiary record, it was nevertheless awarding Gonzalez $50,000, since "[Gonzalez] was married to Salazar for many decades." *Id.* Furthermore, in

42

denying the motion to alter or amend, the district court further explained that it "reasonably inferred injury to the marital relationship after considering the scope of the concept of consortium, Salazar's injuries, and the length of [p]laintiff's marriage to Salazar." *Gonzalez*, 2021 WL 1606182, at *3. In particular, the district court noted that it considered Gonzalez's testimony regarding her change of role in the relationship as "evidence of a deterioration of the marital relationship relevant to calculating damages for loss of consortium." *Id.*

This explanation for the loss-of-consortium award did not violate Rule 52. Indeed, given that Gonzalez placed virtually no evidence into the record regarding this issue, and failed to specifically identify the evidence that was in the record prior to the district court's award, the district court's rationale was sufficient to provide us with as meaningful a basis for review as is possible under the circumstances. The district court referenced the applicable factors and noted its reliance on the limited evidence in the record on this issue to support its award. Under these particular circumstances, nothing more was required to comply with Rule 52.

Moreover, to the extent Gonzalez argues that the failure to cite to any comparable cases in making that determination necessarily violated Rule 52, we

disagree.  As a threshold matter, we note that Gonzalez submitted no comparable

cases on loss-of-consortium awards for the district court to consider before it

rendered its damages determination.  In any event, New York law does not require

the factfinder to consider comparable cases before determining the award; rather,

such comparable cases are utilized in a review of the reasonableness of the

factfinder's determination on damages.  *See, e.g.*, *Cline v. State*, 734 N.Y.S.2d 301,

302–03 (3d Dep't 2001) ("[T]he *standard of review* to determine whether a damage

award adequately compensates a claimant is whether the award deviates

materially from what would be considered reasonable compensation" and courts

"examine comparable cases to gauge what is considered reasonable compensation

for the injuries involved." (emphasis added) (alterations adopted) (internal

quotation marks and citations omitted)).  To be sure, a district court may certainly

consider and reference comparable cases in its determination of a damages award

in a bench trial (as it did here with respect to the pain-and-suffering award).  Such

a practice provides helpful guidance to the district court in a bench trial and also

aids our appellate review of the district court's reasoning.  *See, e.g.*, *Goldstein v.*

*United States*, 9 F. Supp. 2d 175, 189 (E.D.N.Y. 1998) ("[A]s the trier of fact, a judge

can draw from his or her own experiences [with other jury verdicts] in

44

combination with the reported cases in calculating a sum that will reasonably compensate a plaintiff."); *see also Oncay v. Inflasafe USA, Inc.*, No. 19-cv-1428, 2021 WL 6202686, at *8 (N.D.N.Y. Oct. 20, 2021) ("Like awards for pain and suffering, courts look to decisions by juries and other courts in cases with comparable injuries to determine an appropriate award of damages for loss of consortium."). However, because there was a sufficient rationale to explain the award under the particular circumstances presented in this case, the failure to reference comparable cases was not a Rule 52 violation.

B. Assessment of the Damages Award

With respect to the amount of damages for loss of consortium, we discern no basis to disturb the district court's award of $50,000 because, based on this record, it did not deviate materially from what would be reasonable compensation.

The parties understood Gonzalez's claim for loss of consortium to "embrace[] such elements as love, companionship, affection, society, sexual relations, solace and more." *Millington v. Se. Elevator Co.*, 22 N.Y.2d 498, 502 (1968); *see also supra* n.1. This claim seeks to compensate "the interest of the injured party's

spouse in the continuance of a healthy and happy marital life." *Millington*, 22

N.Y.2d at 504–05.

Gonzalez cited to numerous cases in her motion to alter or amend the

judgment before the district court, and does so again on appeal, arguing that these

cases are comparable and establish a relevant range for loss of consortium of

$472,000 to $8.15 million (when adjusted for inflation). These cases, however,

provide no meaningful basis for comparison because the decisions do not describe,

in any detail, the factual circumstances that supported the award in each case.

Moreover, some of the awards in those cases appear to have included loss of

services. Based upon our own survey of cases under New York law, the $50,000

award appears to be well within the range of other comparable cases (even when

adjusted for inflation) involving loss of consortium of this duration or where there

was (as is the case here) threadbare evidence regarding the loss of consortium. *See,*

*e.g., Rangolan*, 370 F.3d at 248 (affirming district court's determination that the

jury's award of $20,000 for loss of consortium was not excessive where "[t]he

district court concluded that, although the evidence of the actual impact on [the

spouse] was scant, some loss of companionship or society can be reasonably

inferred from the state of marriage itself" (internal quotation marks and citation

omitted)); *Clinton v. Brown & Williamson Holdings, Inc.*, No. 05-cv-9907, 2013 WL 3111122, at *22 (S.D.N.Y. June 20, 2013) (holding that $20,000 loss of consortium award did not materially deviate from reasonable compensation where "[p]laintiff's testimony focused on how [spouse's] illness forced her to take on roles he traditionally performed for the family, and she also noted in conclusory fashion that their intimacy changed after his [cancer] diagnosis"). In sum, we conclude that the $50,000 award for loss of consortium does not deviate materially from reasonable compensation under New York law.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.

RICHARD J. SULLIVAN, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the majority on all points except one. For starters, I concur with much of the majority's recitation of the pertinent legal principles, including its holding regarding the appropriate standard for judging the adequacy of a Federal Tort Claims Act damages award, where the nature and measure of the award are governed by New York law. *See* Maj. Op. at 17–26. Furthermore, I join the majority's determination that those legal principles compel the affirmance of Gonzalez's loss-of-consortium award. *See id.* at 40–47. I disagree only with respect to the majority's conclusion that the pain-and-suffering award should likewise be affirmed. *See id.* at 28–39. In my view, the district court's incomplete explanation of that award runs afoul of Federal Rule of Civil Procedure 52(a), which provides that, following a bench trial, district courts "must find the facts specially and state . . . conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Accordingly, without addressing the adequacy of the pain-and-suffering award, I would vacate it and remand for the district court to again "set damages as it sees fit" – this time with a fuller "expla[nation] [of] its rationale." *Malmberg v. United States*, 816 F.3d 185, 199 (2d Cir. 2016).

At its core, Rule 52(a) mandates that district courts "make sufficiently detailed findings to inform the appellate court of the basis of the decision." *T.G.I. Friday's Inc. v. Nat'l Restaurants Mgmt., Inc.*, 59 F.3d 368, 373 (2d Cir. 1995) (internal quotation marks omitted). While Rule 52(a) does not compel "lengthy analys[i]s," it does require district courts to "adequately explain the subsidiary facts and methodology underlying the ultimate finding." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 622 (2d Cir. 2006) (internal quotation marks omitted); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003). And there can be no doubt that Rule 52(a) applies with equal force to both liability determinations and damages awards for pain and suffering. Even though such awards are "subjective opinions . . . formulated without the availability, or guidance, of precise mathematical quantification," district courts nevertheless must "indicate the reasoning process that connects the evidence to the conclusion." *Malmberg*, 816 F.3d at 198 (first quoting *Reed v. City of New York*, 757 N.Y.S.2d 244, 248 (1st Dep't 2003); then quoting *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008)).

Here, I am not persuaded that the district court's explanation of its pain-and-suffering award passes the Rule 52(a) test. To be sure, the district court

2

did a satisfactory job of compiling relevant trial testimony and identifying comparable New York cases. *See Gonzalez v. United States*, 612 F. Supp. 3d 336, 348–49 (S.D.N.Y. 2020) (citing for "guidance" (1) *Mann v. United States*, 300 F. Supp. 3d 411 (N.D.N.Y. 2018), (2) *Mandel v. New York County Public Administrator*, 815 N.Y.S.2d 275 (2d Dep't 2006), and (3) *Olsen v. Burns*, 699 N.Y.S.2d 731 (2d Dep't 1999)). But its ultimate determination – that "[u]pon reviewing the facts of and damages awarded in these cases, $850,000 is an appropriate award here for Salazar's pain and suffering," *id.* at 349 – is wholly conclusory and untethered to any analysis of the cases or the evidence in the record. Nowhere did the district court "indicate the reasoning process that *connect[ed]* the evidence" – i.e., the specific facts of this case and the range set by *Mann*, *Mandel*, and *Olsen* – "to the conclusion" – i.e., the $850,000 award. *Malmberg*, 816 F.3d at 198 (internal quotation marks omitted and emphasis added). As even the majority concedes, once the district court recognized a set of comparable cases, it needed to account for inflation, either explicitly or implicitly. *See* Maj. Op. at 33–34 (quoting *DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003)); *see also, e.g.*, *Perez v. Live Nation Worldwide, Inc.*, No. 158373/2013, 2020 WL 4258745, at *9 (N.Y. Sup. Ct. July 24, 2020). It then needed to provide some explanation for why Salazar's pain and suffering merited

3

an award *lower* than the $1,300,000 inflation-adjusted award in *Mann*, the $2,500,000 inflation-adjusted award in *Mandel*, and the $1,100,000 inflation-adjusted award in *Olsen*.[1]

But it is by no means "apparent" that the district court considered inflation. *Gibbs v. United States*, 599 F.2d 36, 39 (2d Cir. 1979). Indeed, contrary to the majority's contention, there is ample "indication in the record that the district court failed to do so." Maj. Op. at 33–34; *see Gonzalez v. United States*, No. 17-cv-3645, 2021 WL 1606182, at *2 (S.D.N.Y. Mar. 1, 2021) (even after Gonzalez's motion to alter and amend the judgment put the district court on notice of the inflation-adjusted values, district court incorrectly stating that it "arrived at a reasonable figure that *fell within* the range of awards" established by *Mann*, *Mandel*, and *Olsen* (emphasis added)). Moreover, even if the district court *did* consider inflation, it is not "apparent" what facts prompted it to award Salazar $450,000 less than the inflation-adjusted award in *Mann* (when Salazar endured four more months of pain and suffering), $1,650,000 less than the inflation-adjusted award in *Mandel* (when Salazar endured only two fewer months of pain and suffering), and

---

[1] To calculate these figures, I have adjusted the awards to their dollar value as of March 2020, the month of the district court's original judgment. *See Falzon v. JPMorgan Chase & Co.*, 501 F. App'x 92, 94 & n.1 (2d Cir. 2012); *CPI Inflation Calculator*, U.S. Bureau of Lab. Stat., https://data.bls.gov/cgi-bin/cpicalc.pl.

4

$250,000 less than the inflation-adjusted award in *Olsen* (when Salazar endured sixteen more months of pain and suffering). *Gibbs*, 599 F.2d at 39. Those ambiguities alone generate a Rule 52(a) violation, and, far from "serv[ing] no practical purpose," "remand for specification of the basis of the damage award" would provide necessary clarification. *Id.*

Doing the work that the district court should have done, the majority constructs its own justification for the pain-and-suffering award, speculating that the court must have "consider[ed] the length of the delay [in diagnosis] . . . to assess how much of Salazar's pain and suffering was proximately caused by the delay." *See* Maj. Op. at 36–39. That attempt to rationalize the district court's award, however, fails for at least two reasons.

*First*, the majority's theory is internally inconsistent. In one breath, the majority presumes that the district court *adjusted for inflation* after identifying the *Mann*, *Mandel*, and *Olsen* awards. *See id.* at 33–34. In the next breath, while paying lip service to inflation, but in fact relying on figures *not adjusted for inflation*, the majority implies that, because the time period between Salazar's missed diagnosis and his death was less than the analogous time periods in *Mandel* and *Mann* but greater than the analogous time period in *Olsen*, the district court rationally

5

awarded Gonzalez "less than the awards in *Mandel* and *Mann* but greater than the award in *Olsen*." *Id.* at 36–37. But if the district court had in fact accounted for inflation, it would have recognized that the pain-and-suffering award in this case is also *less* than the award in *Olsen*. So, either the district court accounted for inflation without explaining why its award was less than *all* of the so-called comparable inflation-adjusted awards, or it failed to account for inflation as it was required to do. At minimum, that ambiguity renders the district court's analysis impermissibly incomplete. *See Henry*, 445 F.3d at 622 (mandating an "adequate expla[nation]" of the "methodology underlying the ultimate finding").

*Second*, nowhere did the *district court itself* intimate that it understood delay in diagnosis to be a proxy for proximate cause. In fairness, it did hint that delay in diagnosis was generally relevant. *See Gonzalez*, 612 F. Supp. 3d at 349 (noting the length of delay in diagnosis in *Mann*, *Mandel*, and *Olsen*); *Gonzalez*, 2021 WL 1606182, at *3 (commenting that it "weighed," among other factors, "the [g]overnment's delay in diagnosing [Salazar's] condition"). That said, unlike the majority, the district court never explained that it was considering delay in diagnosis to ensure that the award encompassed only Salazar's pain and suffering *proximately caused* by the missed diagnosis. As a result, rather than conducting

6

"intelligent appellate review," *T.G.I. Friday's*, 59 F.3d at 373 (internal quotation marks omitted), the majority ends up elucidating – in the first instance – why delay in diagnosis is "a permissible factor for the district court to consider" when determining a pain-and-suffering award, Maj. Op. at 38–39.[2]

In short, despite the majority's steadfast efforts to justify the district court's conclusion, I find myself still searching for the basis for the district court's pain-and-suffering award. For this reason, I would vacate the award and remand for reconsideration and further explanation. I therefore partially (and respectfully) dissent from the majority's opinion.

---

[2] Candidly, I am doubtful that delay *is* an acceptable consideration in this case. Under New York law, when a plaintiff establishes proximate causation based (at least in part) on the loss-of-chance doctrine, "[d]amages have not been limited to the value of the lost chance." 14 Lee S. Kreindler et al., *New York Law of Torts* § 8:21 (Aug. 2022 Update). A defendant, however, "is, of course, entitled to prove that some of the plaintiff's injury would have existed anyway." *Id.; see also* Maj. Op. at 38. Accordingly, I agree that it would have been appropriate to offset the pain-and-suffering award by the pain and suffering Salazar would have experienced anyway. But I do not see how the length of delay in diagnosis, without more, serves as a meaningful guide for evaluating such an offset.